THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM NALLY, SR., Defendant-Appellant.

Second District No. 2—89—0423

Opinion filed July 22, 1991.

744

G. Joseph Weller, Beth Katz, and Thomas A. Lilien, all of State Appellate Defender's Office, of Elgin, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

On June 8, 1987, Timothy R. McNamee was shot to death in front of his law office in Carpentersville, Illinois. In March 1988, special grand jury proceedings were convened to investigate the matter. In November 1988, the defendant, William Nally, was arrested and charged by indictment with three counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) in connection with the death of McNamee. Prior to trial, defendant moved to suppress the use of a tape-recorded conversation between defendant and Nadine Walter,

said conversation having taking place immediately prior to defendant's arrest. Following a hearing, the defendant's motion was denied, and the case proceeded to trial. A jury found the defendant guilty of first degree murder, and the court imposed a sentence of natural-life imprisonment. The court denied defendant's motion for a new trial, and defendant filed a timely notice of appeal.

On appeal, defendant contends that his conviction should be reversed for the following reasons: (1) the trial court erred in denying the defendant's motion to suppress the audio tapes based on sixth amendment violations; (2) the State failed to prove defendant guilty of murder beyond a reasonable doubt; (3) the trial court erred in denying defendant's motions to admit certain grand jury testimony; (4) the trial court erred in limiting cross-examination of two State witnesses; (5) the trial court, during the sentencing hearing, erred in permitting the deceased's twin brother to make certain statements to the court which exceeded the boundaries of permissible victim impact subject matter; and (6) the trial court erred by considering an improper factor in aggravation and further erred in determining that the offense was brutal and heinous in nature and thus permitted the imposition of an extended-term sentence of natural-life imprisonment. We affirm.

On November 9, 1988, an order authorizing an eavesdrop on a conversation to be had between defendant and Nadine Walter was signed by then Kane County Circuit Court Judge John L. Nickels. Walter was the consenting party to this conversation, which was intended to provide information concerning the death of McNamee. Master Sergeant Edward Miller of the Illinois State Police filed the petition requesting the eavesdrop order, and Assistant Kane County State's Attorney John Barsanti signed a form authorizing Miller to make said request. In addition to the eavesdrop request, Assistant State's Attorney Barsanti prepared a complaint requesting that a warrant be issued for Nally's arrest. Sergeant Miller filed an affidavit in support of the arrest warrant. Barsanti filed these documents with Judge Nickels, who subsequently authorized the eavesdrop and, having found probable cause to support the arrest, issued a warrant at approximately 1 p.m. on November 9, 1988.

Walter, who was wired with a recording device, met Nally at O'Hare International Airport at approximately 8:30 p.m. on November 9, 1988. After engaging in a conversation with Walter from 8:38 to 8:58 p.m., during which time inculpatory statements were made, defendant was arrested.

At a hearing on the motion to suppress, defendant testified that he had previously been represented by attorney Fred Morelli. Defend-

ant stated that, in the summer of 1988, he had retained attorney Bruce Heidecke to represent him during the grand jury investigation into the McNamee murder. Defendant stated that he believed himself to be represented by attorney Heidecke at the time of his arrest on November 9, 1988. Although attorney Heidecke visited defendant at the jail approximately one week after defendant's arrest, he never represented defendant in court subsequent to the arrest. Master Sergeant Miller testified that he had supervised the McNamee investigation task force since December 1987. Miller stated that, due to information provided by Nadine Walter, defendant had become the primary suspect in the McNamee case in November 1988. Miller knew that defendant was represented by counsel on one occasion before the grand jury. Miller stated that, for the protection and safety of Nadine Walter, it was necessary to get an arrest warrant and to place Walter in protective custody. Assistant State's Attorney Barsanti testified that he knew defendant had been represented by attorney Morelli early in the McNamee investigation, but that Morelli indicated late in 1987 or early in 1988 that he no longer represented defendant. Since defendant appeared twice before the grand jury without counsel, Barsanti understood defendant to be unrepresented by counsel. Barsanti stated that, when defendant was subpoenaed to appear before the grand jury in May 1988, attorney Heidecke was present and informed him that he was representing defendant before the grand jury that day.

At the close of the evidence, the trial court denied defendant's motion to suppress the tape-recorded evidence. The court found that, based on *People v. Thompkins* (1988), 121 Ill. 2d 401, defendant's sixth amendment right to counsel had not yet attached at the time of the tape-recorded conversation.

Prior to trial, defendant also moved to admit the grand jury testimony of Cedric Whiteside, wherein Whiteside stated that he had been with a person named Thomas Delaney when Delaney shot McNamee. Defendant argued that the testimony constituted a statement against penal interests and, thus, pursuant to *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, was admissible as an exception to the rule against hearsay. The trial court denied the motion. The case then proceeded to trial.

At trial, the State presented the testimony of 26 witnesses, which can be summarized as follows. Salvatore Macaluso, a Carpentersville police officer, testified that he went to the law offices of McNamee and Mahoney at 6:30 a.m. on June 9, 1987, in response to a report that there had been a shooting. Macaluso found the body of Timothy

McNamee lying face up on the driveway. A Porsche automobile was parked next to the body. Carpentersville police officer Robert Stakes photographed the area, and Macaluso identified photographs of McNamee as he appeared when found. John Creegan, also a Carpentersville police officer, testified that he had been at the law office for a short time on the morning of June 9. He returned at 4 p.m. that afternoon to look for a spent cartridge and found a smear of metal in the wooden door jamb above the front door. He then traced the possible trajectory, looking for spent cartridges. There was a fence running along the northeast side of the property, separating the driveway and parking area from a wooded area. Creegan saw a weapon in some weeds on the land north of the fence. It was a rifle with a black-colored stock and a silver-colored barrel. Creegan indicated that the rifle was found approximately 75 feet from where McNamee had fallen. Officer Stakes testified that he was called back to the law office by Officer Creegan at approximately 4 p.m. and retrieved the rifle from the ground by the fence. The rifle bolt was jammed, and Stakes had difficulty removing it. When he did so, he found a live round in the magazine and a spent cartridge attached to the bolt.

Forensic scientist Brendt Cutro testified that there were no fingerprints on the gun, the spent casing or the live round. The fingerprints found on beer cans lying in the area where the rifle was found did not match defendant's, nor did a palm print found on the Porsche. Donald Smith, an Illinois State police forensic expert, testified that he examined People's exhibit No. 1, a United States model 1917 30-06 caliber rifle. The weapon was manufactured at the Remington Delaware Corporation, Eddystone, Pennsylvania, plant sometime during September 1918. Smith fired the weapon three times without difficulty and characterized the rifle as a high velocity weapon. Federal Bureau of Investigation Special Agent John Riley testified that he conducted compositional analyses on the bullet fragments removed from McNamee and one Remington 30-06 cartridge. Of the fragments suitable for testing, Riley found that they were "generally similar" in composition to the cartridge. Three of the five fine elements that Riley could trace were exactly the same in their percentage, while two other elements were very close, but differed slightly. They were most likely from the same box or manufactured at the same place and time. Riley stated that it was possible, though very unlikely, that they could have come from different boxes or different manufacturers. Dr. Larry Blum, a forensic pathologist, testified that a high velocity rifle, fired from a distance greater than approximately three feet, caused McNamee's wound. According to Blum, the bullet entered McNamee's

body toward the right side and exited at a higher point on the left side of his back. Dr. Blum removed various bullet fragments for analysis. The cause of death was hemorrhagic shock due to injury to the liver. Based on the extent of rigor mortis and lividity, the time of death could have been anywhere from 8 p.m. on June 8 to 2 a.m. on June 9.

Frank Scarpelli, Jr., testified that he had known McNamee for two years. Scarpelli went to the law office at about 4:30 p.m. on June 8 to ask McNamee whether he should mow the lawn. Scarpelli changed clothes and returned with his lawn mower shortly after 5 p.m. McNamee left between 5:45 and 6 p.m. to play softball, and Scarpelli left before 7 p.m. Scarpelli next saw McNamee at about 7:30 p.m. at Bandito Barney's, a bar owned by McNamee and one of his brothers, where Scarpelli also worked. McNamee was leaving to go back to his office.

Lisa Mapa testified that she met McNamee at a bar in January 1987 and dated him occasionally. On the evening of June 8, 1987, Mapa went with three friends to the Dairy Queen in Dundee, Illinois, passing by McNamee's law office at about 9:15 p.m. The lights were on inside the building, and McNamee's car was parked in the driveway. Mapa stated that, 25 minutes later, on her way home, the lights were off at the office except for one outside by the garage. McNamee's car was still in the driveway and something that looked like a garbage bag was on the ground next to the Porsche.

Timothy Mahoney, McNamee's law partner, testified that he last saw McNamee between 9:10 and 9:20 p.m. on June 8, 1987. At that time, McNamee was wearing a baseball uniform and smoking a cigar. They carried some files out to Mahoney's car, and Mahoney left immediately thereafter. Both Mahoney and McNamee drove Porsche 944 cars. One was black and the other dark gray. McNamee's car had originally been used by Mahoney, until Mahoney acquired a new one. The first car retained the original license plates. On the night of the shooting, McNamee had parked his car in Mahoney's space. Mahoney returned to the law office at about 6:45 a.m. on June 9, 1987, after being notified of the shooting. A cigar found on the pavement near McNamee appeared to be the same cigar he had been smoking the night before. It had not changed much in length.

Mahoney further testified that he had been retained by Rolando Rodriguez in 1985 to represent him in a custody dispute between Rodriguez and Walter over their son, Zachary, and that his relationship with Walter was volatile. Mahoney stated that Walter had filed a petition for leave to take the child to Tennessee and that she had also re-

quested termination of Rodriguez' visitation. The court denied Walter's petitions. After she took Zachary to Tennessee in violation of the court order, Walter was held in contempt of court and her arrest was ordered. Rodriguez was granted temporary custody until Walter had purged herself of the contempt charge. Mahoney stated that he had not known that Rodriguez was going to take Zachary in June 1987. He was notified that Rodriguez in fact had custody of Zachary by then Kane County Circuit Court Judge Dunn and a Kentucky police department on Sunday, June 7, 1987. Mahoney stated that he saw Rodriguez at his law office on June 8 at approximately 8 p.m. They discussed the fact that Rodriguez had obtained the child pursuant to the order granting him temporary custody and holding Walter in contempt of court. Rodriguez left the office at about 8:20 p.m. Mahoney stated that he did not know where Rodriguez was and that he had not seen him since the night of June 8, 1987.

Glen Gasdiel testified that he purchased an old Enfield rifle at a garage sale in Elgin. He later obtained three shells and a clip for the rifle at a flea market. About six months after he purchased it, Gasdiel gave the rifle to Chuck Taylor, a friend of his son, Michael. According to Gasdiel, the weather was cold when Taylor took the gun to see if he could sell it to someone he knew. Gasdiel gave Taylor the ammunition so that the person checking it could see if it worked. Gasdiel identified the rifle found on the grounds of the law office as the one he had purchased at the garage sale. The Federal Bureau of Investigation (FBI) contacted Gasdiel during the course of the McNamee investigation. Gasdiel stated that the FBI report embellished on the facts as he related them, including the fact that Gasdiel's son Michael was with Taylor when he took the gun. Gasdiel stated that he did not remember his son being there at the time. Later, after Taylor had the gun, Taylor threatened to kill Gasdiel along with Gasdiel's wife, son and attorney. This threat was reported to the police.

Michael Gasdiel testified that he had known defendant for about five years. He had known Chuck Taylor for about 10 years. Michael identified People's exhibit No. 1, the rifle, as having belonged to his father. Michael stated that in February 1987 he brought Chuck Taylor to his father's house so Taylor could get the rifle. Taylor and Michael left in Michael's station wagon and stopped at his apartment. Taylor then drove them to the Walnut Inn tavern in Michael's car. Taylor dropped Michael off at a gas station on the corner, about one-half block from the tavern. Taylor pulled into the Walnut Inn parking lot, where he got out of the car carrying the rifle. Michael then stated that he saw Taylor give the gun to defendant. Taylor then came back

and picked up Michael. Michael did not see what defendant did after that, but he noticed that the gun was gone from the back of the station wagon. Michael did not recall being convicted or sentenced for theft in 1980. He stated that he did not know whether he had any charges pending against him at the time of trial. At a sidebar during defense counsel's attempted impeachment of Michael, the court instructed defense counsel that he could only bring out information regarding pending charges if there had been a plea bargain offer from the State. Defense counsel later requested that the court take judicial notice of a pending felony charge. The motion was denied. The jury was subsequently informed that Michael had a prior misdemeanor theft conviction from 1980.

Russ Webster, Jr., testified that he had known defendant for 10 or 15 years. In the spring of 1987, Webster arranged the storage of some boxes for defendant. He did not know what was in the boxes, but stated there were four or five, most of which were small and square, and one of which was about 3½ feet high and 8 to 12 inches wide. Defendant retrieved the boxes one or two days before McNamee was killed. Rick Swendsen testified that the boxes were kept in his storage shed.

Nadine Walter testified that she was 26 years old and the mother of a 3½-year-old boy. Her parents were divorced; her mother lived in Utah and her father lived in Tazewell, Tennessee. Walter's ex-husband, Rolando Rodriguez, was the father of her son Zachary. Walter and Rodriguez had separated prior to Zachary's birth on April 26, 1985. When Zachary was seven days old, he was taken by Rodriguez, and Walter sought a court order granting her custody. Rodriguez was represented in those proceedings by Timothy Mahoney. Zachary was returned two days later. Zachary was taken again in June 1985 and returned three days later. Walter had custody at that time with structured visitation for Rodriguez. In December 1986, Walter was living in Carpentersville. In January 1987, she took Zachary, in violation of a court order, and went to her father's house in Tennessee. Walter and Zachary spent the end of January, February and March 1987 in Florida. She moved back to Tennessee at the end of March and rented an apartment of her own in Tazewell.

Walter testified that she had known defendant for seven or eight years. For the most part they were friends, although they had been romantically involved for 1 to 1½ years before May 1987, when they broke up. Defendant visited Walter in Tennessee three times, driving there in a green, 1978 Camaro. On Sunday, June 7, 1987, Walter was scheduled to work at 11 a.m. She left for work at 10:45 a.m. and

passed defendant, who was driving toward her house. Walter turned around and followed defendant. Defendant then followed Walter back to work. When she arrived at work, Walter was given a message to call her father. Walter's father then told her that Rodriguez had struck him with a car and taken Zachary. Defendant drove Walter to her father's house, where she looked for the document granting her custody of Zachary. Walter called the Pineville police department and learned that Rodriguez had been detained along with Zachary and another person. Walter called the police department again later and was informed that Rodriguez, Zachary and the third person had been allowed to leave.

Later that afternoon, Walter and defendant left in the Camaro to look for Rodriguez. According to Walter, they looked in rest stops and truck stops throughout Indiana. Eventually, they decided to return to Elgin and check Rodriguez' mother's and brother's houses. They had left Tennessee late in the afternoon, and it was dark when they reached Elgin. They were unable to find Rodriguez and went to Walter's mother's house in Carpentersville to sleep. Walter stated that she "laid around" the house all of June 8, 1987. Defendant left at about 10 a.m. He returned, but was gone again for part of the afternoon. Walter did not know where defendant had gone. Defendant, Walter and her mother ate dinner together at the house at about 5 p.m. Walter and defendant then had a conversation in a bedroom. Defendant told Walter that McNamee and Mahoney were going to be killed because they had "ripped off" a drug dealer and that "if they were killed tonight it would scare Roy [Rodriguez] and I would get Zachary back because of his attorney's death." With them in the room at the time was a gun rapped in a blue blanket. Walter did not actually see the gun, but defendant told her it was a gun and that it could not be traced. The length of the gun rapped in the blanket was similar to People's exhibit No. 1, the rifle.

Walter and defendant then left the house in the Camaro. Defendant drove to an Osco drug store where he purchased some pink, cloth gardening gloves. They then drove past the law offices several times, noticing a pickup truck, a black Porsche and an aqua Accord parked in front, as well as more cars parked along the north side of the driveway. After driving around for about two hours, defendant finally parked at Masi's restaurant, which was in a mall down the street from the law offices. Defendant got out of the car, and Walter moved into the driver's seat. Walter was supposed to pick defendant up after she heard shots. Defendant proceeded to walk north, carrying the wrapped gun and pink gloves, toward the law offices. After waiting in

the car between one-half hour to an hour, Walter heard a shot and drove quickly to the law offices, stopping just north of them on Route 31. Defendant stepped into the street and entered the car on the passenger side. According to Walter, defendant stated, "one down, one to go." At the time, defendant was not holding anything in his hands, nor was he wearing the gardening gloves.

Defendant and Walter then drove to Walter's mother's house. Walter got some clothing and they went to defendant's mother's house, where he left the car briefly. Defendant and Walter then drove back to Tennessee. Walter stated that they stopped for gas twice: once heading north into Illinois on June 7, and once on the way back to Tennessee on June 9. Both stops were made at a place south of Indianapolis. They reached Tazewell between 5 and 7 a.m. the next morning. On the drive from Elgin to Tennessee, defendant told Walter that, because of what they had just done, Zachary would be returned to Walter's mother's house. Defendant also told Walter that Mahoney, McNamee and Rodriguez were all present when McNamee was shot, and that the gun had jammed.

On November 9, 1988, Walter met defendant at O'Hare International Airport. Walter, while wearing an eavesdropping device, then recorded the subsequent conversation between herself and defendant. Later, upon hearing the tape, Walter made a number of corrections on a typed transcript. She stated that the final copy was accurate.

On cross-examination, Walter admitted that, in an interview with Officers James Kerns and Joseph Rollins on September 30, 1987, she had told them that she had no information regarding the identity of the person who had shot McNamee. At some point, though not necessarily during that particular interview, the officers mentioned that they could be of help in getting Walter's son back to her. Walter also admitted having told Carpentersville police officer Jerry Ford, in December 1987, that neither she nor defendant was involved in McNamee's murder. Walter also stated that, in the various print and television interviews she had given regarding Zachary's disappearance, she maintained that she and defendant had been in Tennessee and had no information about the murder. Walter also told Officer Kerns, in January 1988, that defendant had been in Tennessee until the Thursday after McNamee's death. She told Kerns that she thought drugs and drug rip-offs designed to put dealers out of business had resulted in the murder. She had further stated that she felt Rodriguez and Mahoney were involved in drugs together. Walter also admitted that she told Officers Kerns and Rollins that Mahoney had threatened her and stated that she would "end up just like his partner."

Walter stated that she had also filed a $9 million lawsuit against Mahoney, which contended that he had altered court documents in her custody dispute. Walter had asked her attorney, Fred Morelli, to write a letter to the judge in that case which explained her concerns. Walter also stated that she had believed law enforcement agencies were pressuring her to implicate defendant in McNamee's murder.

Walter also testified that she had been granted immunity from prosecution regarding both the McNamee murder and a $35,000 credit card fraud scheme in exchange for her testimony. Walter stated that she was aware that a $50,000 award had been offered in this case and also knew that the figure had eventually become $100,000. Walter had a collection of newspaper articles covering the murder, as well as five video tapes with news accounts and stories on the murder. Walter admitted that it upset her that defendant and her mother were romantically involved and that she had threatened to tell the police that defendant was involved in the McNamee murder because of this.

Illinois State Police Master Sergeant Dannie Pierce testified that he was in charge of the overhear between Walter and defendant on November 9, 1988. Walter wore a wire and carried a small tape recorder in her purse. Pierce simultaneously operated another tape recorder which also recorded her conversation with defendant. The tape began at 8:38 p.m. and was turned off at 8:58 p.m., whereupon defendant was placed under arrest. The original tape had a great deal of background noise on it, and an equalized copy was made which reduced that problem. Over defendant's objection, the equalized version was then played for the jury. Jurors were provided with copies of the transcript, with Walter's handwritten corrections, to assist them as they listened. The transcript comprises eight typed, single-spaced pages. The following excerpts, however, are particularly revealing and serve to discredit defendant's later testimony that he made certain statements purposely in order to sound suspicious to police and that he did not shoot McNamee. For example, at several points in the conversation, Walter questions defendant about the gun used to kill McNamee. When Walter asks who knows that defendant had the gun, defendant responds, "Big Russ." Defendant then states, "Yes, he knows I had it. I went and got it the morning I killed the mother fucker." When Walter asks if defendant got the gun from Russ, defendant answers, "Yes, and I killed the mother fucker the same day." Walter also asks defendant, "Does Russ know that you killed him?" Defendant's response is that "[i]t wouldn't be hard to figure out. I mean, my God, I come [sic] and got the fuckin gun from him

and that night he died; I mean 2 and 2's [*sic*] 4, right?" Later, when Walter expresses regret that they left the gun at the scene of the shooting, defendant responds, "I'm supposed to carry it out in light of all the traffic and everything and put it in the car? Sure!" Following the presentation of the taped conversation, the State rested its case. The defendant's motion for a directed verdict was heard and denied.

Defendant testified in his own behalf. Defendant stated that he had first met Walter in 1982. They had a romantic relationship for a year or so until she met her former husband, Rodriguez. They were sporadically involved later on as well. Defendant stated that, in June 1987, he drove to Tazewell, Tennessee, to bring Walter some of her household items. Defendant packed up the Camaro and drove down on Sunday, June 7. He passed Walter on the road, and she had him follow her to work. When they arrived, Walter made a phone call and became hysterical. Defendant drove Walter to her father's house, where they discovered that her father had been hit by a car. Defendant then spoke with his sister-in-law and also contacted his brother to have him look for Walter's son in the Elgin area. Defendant and Walter then went to Walter's house, where defendant gave Walter some pain-killers to calm her down. Defendant then unloaded the car and went to sleep in the living room. When he woke up, it was late and Walter and the Camaro were gone. Defendant thought that she had gone to her father's and he went back to sleep. Defendant stayed at Walter's house all of Monday, June 8. He next saw Walter on Tuesday morning when she arrived home.

Defendant admitted having told the grand jury several times that Walter was with him in Tennessee on June 7 and 8. Defendant further admitted that those statements were lies. He stated that he never told the grand jury that Walter had said she drove into Indiana. Defendant stated that on Wednesday, June 10, Walter contacted a friend who was a Carpentersville police officer and was told that defendant was a suspect in the McNamee murder. Defendant stated that Walter had many friends who were police officers. Defendant made an appointment to meet with Officer Jerry Ford at 1 p.m. Friday afternoon and returned to Illinois with Walter in her Grand Prix. They left Tennessee at midnight or a little thereafter, stopping for gas in Louisville, Kentucky.

Defendant denied having been in Elgin on June 8, 1987. He further denied that he obtained a gun, wrapped it in a blue blanket, purchased pink gardening gloves, or that he had anything else to do with the death of Timothy McNamee. Defendant stated that he had fired a replica of a 1917 Eddystone rifle at a Tennessee gun range. He stated

that Walter had bought it sometime in 1987 as a Christmas present for her father, and that the gun had a blue finish and a brown stock.

Defendant stated that Walter had become "nasty" when he started dating her mother and that she threatened to have him arrested for the McNamee murder. Walter's mother subsequently went to live with defendant's mother and later moved to Utah. Defendant helped her move, and Walter made flight arrangements for his return trip to Illinois. The night before defendant returned, Walter had called him to confirm his plans. Defendant told her that he had made other arrangements for a ride from the airport, and Walter became very upset. Defendant agreed to let Walter meet him at the airport, and when he walked off the plane, Walter ran up and grabbed him, which, according to defendant, was highly unusual. Defendant stated that he became suspicious at this point that "they had sent another person wired to [him]," and he assumed that Walter had made a deal with the police. Defendant stated that during their ensuing conversation he was trying to say "just enough to be suspicious." Defendant stated that they talked about information generally available through the newspapers and television reports. Defendant admitted making the statements on the tape, but stated that he had not shot Timothy McNamee.

Delores Zimmerman of Carpentersville testified that she and her son, Russell Buschek, were travelling south on Route 31 at approximately 11:35 p.m. the night of the murder. Zimmerman stated that it was a warm night and the car windows were down. As they approached the area just north of the woods, which abutted the law office on its northern border, Zimmerman heard the loud voices of a woman and two men. Not long after that she heard what sounded like a firecracker and a ricochet. When they reached the law offices, the inside lights, the garage lights and the sign out front were illuminated. In the driveway was a car parked facing west toward the garage. There appeared to be something like a garbage bag lying in the driveway. There was another car parked on the southern part of the U-shaped driveway, facing south. Zimmerman saw someone run to the second car. That car came speeding out of the driveway and Buschek, who was driving, had to slam on the brakes to avoid hitting it. Zimmerman was able to see the occupants of the car as it came around the front and stopped at the side of her car. Buschek screamed at the other driver, and the passenger yelled back. Zimmerman stated that the car was sporty and black with a scratch by the right, rear bumper. The driver had long brown hair and a brown mustache. Zimmerman did not report the incident that night, but called

the Carpentersville police the next day after having heard about McNamee's death. Later, after seeing newspaper pictures, Zimmerman thought Timothy Mahoney looked like the driver of the black sports car. Upon showing the newspaper to her son, while covering up the name, he agreed that Mahoney "seemed like the guy."

Department of Criminal Investigations Agent Charles Gross testified that he was involved in the McNamee investigation. Gross spoke with Delores Zimmerman early in July, and she told him what she had seen and heard in front of the law office the night McNamee was killed.

Russell Buschek substantially corroborated the testimony presented by his mother. He identified the black sports car as a Porsche and stated that the driver had long, dark hair "put back," and gray hair and a dark mustache. Upon being shown the newspaper picture of Mahoney, Buschek thought he could have been the driver. Buschek stated that he and his mother had been told by a Department of Criminal Investigations agent to be careful about testifying in this case.

Jeannette Blanco testified that she had known Walter for two years and that they had worked together at Zayre. Blanco had known defendant for one year. Blanco stated that she had been present when Walter became upset about the relationship between defendant and Walter's mother and that she heard Walter threaten defendant, saying that she was going to tell everyone that he killed the lawyer. Christine Shields testified that she and Walter had grown up together and that she had known Walter for 23 years. According to Shields, they had discussed McNamee's murder, and Walter never indicated that she had been involved. Shields also stated that she had dated Rodney Nally, defendant's brother, who had accompanied her to court that day. Robert Murphy lived with Walter in June 1988. Murphy stated that, after police had been to the house to discuss the McNamee case, Walter told him that she could not have been involved because she was in Tennessee at the time. Murphy stated that he was also present on several occasions when Walter threatened to set up defendant for the murder. Murphy also admitted that he occasionally socialized with defendant's brothers. Defendant's brother, Kenneth Nally, testified that defendant called him on Sunday, June 7, 1987, at about 7 p.m. Kenneth believed the call to be long distance from the sound of the connection. They spoke for 15 or 20 minutes, and defendant asked Kenneth to look for members of the Rodriguez family. Defendant called him back twice, the second time being about 6:45 p.m. Monday evening. That connection, too, sounded long distance. Kenneth never

called defendant, and the next time he saw defendant was a week to 10 days later.

Timothy Mahoney was recalled and testified that his car rolled into a thicket of bushes approximately one week to 10 days before the murder. The car sustained minor rear-end damage on the bottom right quarter panel, and scratches on the right side. Mahoney stated that, over dinner on Friday night, June 5, McNamee had advised him to be careful and not to be around him. Mahoney further stated that on June 6 he spoke with McNamee at about 3:30 p.m., whereupon McNamee told him that "something was going to happen." McNamee believed that the police were following him and offered to give Mahoney a gun. Mahoney stated that McNamee was referring to members of the Algonquin police and the Illinois State police. The defense then rested its case. Following the presentation of rebuttal witnesses, the State rested as well.

Prior to closing arguments and jury deliberation, counts I and II of the indictment were nol-prossed, leaving only the third count for the jury's deliberation. The jury subsequently found defendant guilty of first degree murder. Defendant's post-trial motion was heard and denied, and the case proceeded to a sentencing hearing. After hearing testimony and considering factors in aggravation and mitigation, the trial court sentenced defendant to an extended term of natural-life imprisonment.

On appeal, defendant first contends that the trial court erred in denying the motion to suppress, on the ground that the tape-recorded evidence of a conversation between defendant and Nadine Walter was obtained in violation of his sixth amendment right to counsel. Specifically, defendant argues that he had invoked his sixth amendment right to counsel months before his arrest; that the State's delay in executing the arrest warrant was an improper attempt to circumvent his sixth amendment rights while gathering additional evidence; and that his right to counsel had attached based upon the extensive involvement of the prosecution in the preindictment proceedings. The State argues that the tape-recorded conversation was obtained immediately before defendant's arrest and that prior thereto defendant had not been questioned by police or taken into custody. Therefore, based on *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *United States v. Gouveia* (1984), 467 U.S. 180, 81 L. Ed. 2d 146, 104 S. Ct. 2292, adversarial judicial proceedings had not been initiated against defendant, and the sixth amendment right to counsel had not yet attached. We note parenthetically that, although defendant also argued at the hearing on the motion to suppress that his fifth

amendment right against self-incrimination had been violated, he has not raised this argument on appeal, and we do not now consider it.

We first address defendant's argument that he had invoked his sixth amendment right to counsel months prior to his arrest, when he was represented by counsel before the Kane County grand jury and conclude that it is without merit. Rather, we agree with the State that, based on *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, the fact that there existed a prior attorney-client relationship does not necessarily implicate the sixth amendment right to counsel. Defendant argues that *Moran* is inapposite in that, unlike *Moran*, defendant did not receive *Miranda* warnings prior to his conversation with Walter and, furthermore, that defendant had indicated by his prior conduct, when called before the grand jury, that when dealing with the authorities regarding the McNamee case he desired the assistance of counsel. We believe it is defendant who misapprehends the full import of *Moran*, wherein the Court addressed both fifth and sixth amendment claims. In *Moran*, a suspect confessed after receiving and waiving his *Miranda* rights. He did so without knowledge that his sister had retained an attorney to represent him and that another attorney had been in telephone contact with the police. While the attorney was told that the defendant would not be questioned until the following day, police in fact interrogated him later that evening, securing three written statements from the defendant. The Court concluded that a suspect's knowing and intelligent waiver of his *Miranda* rights does not require knowledge that an attorney has been retained or information that the attorney has been in contact with the police or has attempted to see the suspect and that therefore no violation of the defendant's fifth amendment right against self-incrimination had occurred. *Moran*, 475 U.S. at 428, 89 L. Ed. 2d at 425, 106 S. Ct. at 1144.

The defendant in *Moran* also argued that his sixth amendment rights were violated, contending that the sixth amendment protects the integrity of the attorney-client relationship and that the right to noninterference with an attorney's dealings with a criminal suspect arises at the moment that relationship is formed. We note that defendant's argument in the instant case, that the "sanctity" of his prior attorney-client relationship must now be upheld, is quite similar to that proposed by the defendant in *Moran*. The Supreme Court in *Moran* was not persuaded and stated as follows:

> "Questions of precedent to one side, we find respondent's understanding of the Sixth Amendment both practically and theoretically unsound. As a practical matter, it makes little sense to

say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. [Citation.] More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor." (*Moran*, 475 U.S. at 430, 89 L. Ed. 2d at 426-27, 106 S. Ct. at 1145-46.)

Thus, we are not persuaded by defendant's attempt to distinguish *Moran* based on the argument that defendant did not receive his *Miranda* warnings and may have been previously represented by counsel in connection with this matter. These are fifth amendment concerns not at issue in this case. We conclude that the fact that defendant had been represented by counsel during previous appearances before the grand jury does not give rise to sixth amendment protections.

■■ Defendant also contends that the State's delay in executing the arrest warrant was an improper attempt to gather additional evidence while circumventing his sixth amendment right to counsel. Defendant relies on *People v. Scudder* (1988), 175 Ill. App. 3d 798, in support of his argument. In *Scudder,* a complaint was being prepared by the police when the defendant walked into the police station because he had heard that authorities were looking for him. Rather than arrest the defendant then, or request that he wait until the complaint was completed, the police let the defendant leave and arrested him 10 minutes later in his car so that they could search the car incident to arrest. In reversing the defendant's conviction and the denial of his motion to suppress the evidence obtained by the search of his car, this court noted the general rule that the police may not use an arrest as a pretext to search for evidence. (*Scudder*, 175 Ill. App. 3d at 801.) Rather, the search must be incident to the arrest and not vice versa. (175 Ill. App. 3d at 801.) We concluded that the police, in violation of the fourth amendment prohibition against unreasonable searches and seizures, had manipulated the timing of the arrest so that it would occur when the defendant was in a place that the police wished to search but had no legal basis for doing so. Such conduct constituted an improper attempt to exploit the search incident to arrest doctrine in order to provide the necessary justification. 175 Ill. App. 3d at 803.

■ Such is not the case here, and we agree with the State that defendant's reliance on *Scudder* is misplaced and that no sixth amendment violation occurred as a result of the timing of defendant's arrest. First, *Scudder* involved fourth amendment violations not implicated or argued in the instant case. Second, the police in *Scudder* timed the arrest so that they could search an area, the defendant's car, that they presumably could not have searched except incident to arrest. Here, the State obtained an eavesdrop authorization from the court, thus providing the legal basis presumptively absent in *Scudder*. The relevant question, therefore, is not whether the eavesdrop and subsequent arrest were improper *per se,* but whether the tape-recorded conversation itself was properly admitted into evidence.

Defendant also contends that, based upon the amount of preindictment prosecutorial involvement in this case, his sixth amendment right to counsel had attached at the time of the tape-recorded conversation on November 9, 1988. Specifically, plaintiff argues that Assistant State's Attorney Barsanti had been involved in the investigation of the McNamee case, through the convening of a grand jury, for eight months prior to defendant's arrest. In addition, Barsanti arranged for the granting of State and Federal immunity from prosecution to Nadine Walter and also arranged to provide Walter with living arrangements and expenses between the time of the tape-recorded conversation and the time of trial. Barsanti also prepared and filed the documentation for the eavesdrop authorization and arrest warrant. Based upon these facts, defendant argues that the level of prosecutorial involvement gave rise to sixth amendment protections.

In this regard, the United States Supreme Court and the Illinois Supreme Court appear to have stated somewhat different interpretations of when the sixth amendment right to counsel attaches. In *Kirby v. Illinois* (1972), 406 U.S. 682, 688-90, 32 L. Ed. 2d 411, 416-18, 92 S. Ct. 1877, 1881-82, a plurality of the United States Supreme Court summarized its prior case law in this area as follows:

> "In a line of constitutional cases in this Court stemming back to the Court's landmark opinion in *Powell v. Alabama,* 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55, it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. [Citations.]

> *** [W]hile members of the Court have differed as to existence of the right to counsel in the contexts of some of the above cases, *all* of those cases have involved points of time at or after the initiation of adversary judicial criminal proceed-

ings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. [(Emphasis in original.)]

\* \* \*

The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is *only then* that the government has committed itself to prosecute, and *only then* that the adverse positions of government and defendant have solidified. It is *then* that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is *this point,* therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." (Emphasis added.)

See also *United States v. Gouveia* (1984), 467 U.S. 180, 187-89, 81 L. Ed. 2d 146, 153-55, 104 S. Ct. 2292, 2297-98.

In *People v. Hayes* (1990), 139 Ill. 2d 89, 124-26, the Illinois Supreme Court, after recognizing the above language, considered the issue of whether, depending on the degree of prosecutorial involvement, the sixth amendment right to counsel can attach automatically upon the filing of a criminal complaint. In this regard, the court set forth the following analysis:

"The United States Supreme Court has not yet decided whether the sixth amendment right to counsel attaches automatically upon the filing of a criminal complaint. (See *United States v. Gouveia* (1984), 467 U.S. 180, 189-90, 81 L. Ed. 2d 146, 155-56, 104 S. Ct. 2292, 2298-99.) This court, however, has considered the issue on several occasions. In *People v. Owens* (1984), 102 Ill. 2d 88, the court observed that 'there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement.' (*Owens,* 102 Ill. 2d at 101, citing *State v. Johnson* (Iowa 1982), 318 N.W.2d 417, 435 (while the filing of a simple complaint by or at the direction of the prosecutor may constitute the initiation of adversarial proceedings, the filing of such a complaint by a police officer in order to secure an arrest warrant, with no indication of prosecutorial involvement, does not necessarily have a similar effect).) \* \* \*

In *People v. Wilson* (1987), 116 Ill. 2d 29, 50-51, this court held that the filing of a complaint by a police officer to obtain a warrant for the defendant's arrest did not signal the initiation

of adversarial proceedings against the defendant. In so holding, the court emphasized that the complaint for an arrest warrant was presented to the judge *ex parte*, that the complaint was presented by a police officer rather than an assistant State's Attorney, and that the complaint was not filed until after the defendant appeared in the lineup. In such circumstances, the court concluded that the procedure did not initiate adversarial proceedings against the defendant.

In *People v. Thompkins* (1988), 121 Ill. 2d 401, this court again indirectly addressed the issue when considering whether a defendant's sixth amendment right to counsel had attached at the time he was interrogated by and confessed to the police. The court held that the defendant's sixth amendment right to counsel had not attached following his arrest pursuant to an arrest warrant, because adversary judicial proceedings had not been initiated against him. The court noted that only a complaint for preliminary examination charging the defendant with murder had been issued and the defendant had been neither indicted nor arraigned. The court stated that the complaint did not constitute a commitment by the People to prosecute the defendant, and that the defendant's sixth amendment right to counsel therefore had not attached at the time he was interrogated and confessed.

*Owens, Thompkins* and *Wilson* demonstrate that, in determining whether an accused's sixth amendment right to counsel attached upon the filing of a criminal complaint, the court must consider the degree to which the State's prosecutorial forces have focused upon the accused. The prosecutor here, unlike *Owens* and *Thompkins,* reviewed the criminal complaint against the defendant before it was filed in the circuit court. The prosecutor's involvement in the procurement of the warrant, however, was not significant and did not signal a commitment by the State to prosecute the defendant. The complaint for preliminary examination was presented in an *ex parte* proceeding by a police officer, rather than an assistant State's Attorney. Moreover, the complaint for preliminary examination, upon which the warrant issued, charged the defendant with the offense of attempted armed robbery *** rather than the murder of which the defendant was ultimately convicted. *** Absent proof of significant prosecutorial involvement in procuring the arrest warrant, we conclude that the defendant's sixth amend-

ment right to counsel had not attached as to the murder charge at the time of the lineup." *Hayes,* 139 Ill. 2d at 124-26.

■ From the foregoing, it would appear that the United States Supreme Court has set fairly explicit guidelines as to when the sixth amendment right to counsel attaches, *i.e.,* not until the initiation of adversary judicial proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment. Illinois, on the other hand, appears to have taken a somewhat more expansive view, to the effect that the sixth amendment right to counsel may attach at an earlier point in time, depending on the extent of prosecutorial involvement. Thus, our conflict in the instant case lies in the fact that, while the State relies primarily on the Federal case law, which, arguably calls for a narrower construction of the sixth amendment right to counsel, the defendant relies primarily on the Illinois case law, which, arguably has somewhat expanded such rights.

■ Of course, it is well established that, while State courts are free to grant individuals more rights than those guaranteed by the United States Constitution so long as they do so on the basis of State law or the State Constitution, State courts must follow the United States Supreme Court's rulings on the meaning of the United States Constitution. *Oregon v. Hass* (1975), 420 U.S. 714, 719, 43 L. Ed. 2d 570, 575-76, 95 S. Ct. 1215, 1219; see also Nowak, Rotunda & Young, Handbook on Constitutional Law 21 (1978).

■ Here, it is undisputed that, at the time the tape-recorded conversation took place, only a complaint to secure an arrest warrant had been filed; defendant had been neither arrested, indicted nor arraigned. Regardless of the amount of prosecutorial involvement prior to the arrest, we agree with the State that, under the explicit holdings of the United States Supreme Court, which must govern our analysis of the meaning of the United States Constitution (*Hass,* 420 U.S. at 719, 43 L. Ed. 2d at 575-76, 95 S. Ct. at 1219), formal adversary judicial proceedings had not yet been initiated against defendant so as to give rise to sixth amendment protections (*Kirby v. United States,* 406 U.S. at 688-90, 32 L. Ed. 2d at 416-18, 92 S. Ct. at 1881-82; *United States v. Gouveia,* 467 U.S. at 187-89, 81 L. Ed. 2d at 153-55, 104 S. Ct. at 2297-98). To conclude otherwise would be contrary to the traditional Federal analysis and would serve improperly to reduce the initiation of judicial proceedings to "a mere formalism." *Kirby,* 406 U.S. at 689, 32 L. Ed. 2d at 417-18, 92 S. Ct. at 1882.

We find further support for this conclusion by reference to certain provisions in the Illinois Code of Criminal Procedure. For example, Illinois law provides that felony prosecutions must be commenced by in-

dictment or information and not by complaint. (Ill. Rev. Stat. 1987, ch. 38, par. 111—2.) The jury in this case was in fact instructed that "[t]he indictment in this case is the formal method of accusing the defendant of an offense and placing him on trial." (Illinois Pattern Jury Instructions, Criminal, No. 2.02 (2d ed. 1981).) Here, it is undisputed that defendant was not indicted for first degree murder, a felony, until November 15, 1988, approximately one week after the tape-recorded conversation and arrest took place. Furthermore, Illinois law also provides that the office of the State's Attorney is responsible for authorizing applications for orders approving the use of eavesdropping devices by law enforcement officers or agencies. (Ill. Rev. Stat. 1987, ch. 38, par. 108A—1.) The State's Attorney is also responsible for initiating the process whereby witness immunity may be granted. (Ill. Rev. Stat. 1987, ch. 38, par. 106—1.) These prosecutorial functions are thus both legitimate and pursuant to statute. Finally, we also note that, for every act that, according to defendant, evidences excessive prosecutorial involvement, the police had a corresponding role. For example, while Assistant State's Attorney Barsanti signed the form authorizing the police to petition the court for an eavesdrop order, Officer Edward Miller of the Illinois State Police signed the actual petition. And while Barsanti prepared and presented the complaint seeking a warrant for defendant's arrest, Officer Miller signed an affidavit and testified before Judge Nickels in support of the arrest warrant. Thus, it is clear that this was not a case where the prosecution simply ran the entire investigation to the exclusion of the police.

■ Thus, we believe that the above-referenced statutory provisions, together with the facts of this case, indicate that, at the time of the tape-recorded conversation and subsequent arrest, defendant's sixth amendment right to counsel had not yet attached, whether by way of prosecutorial involvement or otherwise. Therefore, the trial court did not err in denying defendant's motion to suppress the tape-recorded conversation.

Defendant also argues that, should this court determine that the tape-recorded conversation between defendant and Nadine Walter took place in violation of defendant's sixth amendment right to counsel and should have been suppressed, then the remainder of the evidence was insufficient to prove defendant guilty of murder beyond a reasonable doubt. The State argues that, based on *Lockhart v. Nelson* (1988), 488 U.S. 33, 40-41, 102 L. Ed. 2d 265, 273-74, 109 S. Ct. 285, 290-91, a reversal on appeal for insufficiency of the evidence should be granted only when, after consideration of all the evidence admitted at trial, whether erroneously or not, the conviction cannot stand. The

State maintains, therefore, that it would be inappropriate, should this court find that the tape-recorded evidence should have been suppressed, to review the sufficiency of only the remaining evidence and that the proper remedy would be to remand the case for a new trial.

Defendant contends that a number of circumstances demonstrate that his guilt was not proved beyond a reasonable doubt. Defendant maintains that the testimony of Nadine Walter was too incredible to sustain the State's burden of proof and points to five factors in support of this contention. First, defendant notes that Nadine Walter admitted collecting most of the print and television news accounts pertaining to McNamee's murder. Second, Walter was friends with many law enforcement officials, including members of the Carpentersville police department. Third, Walter wanted to avoid prosecution herself and was therefore granted immunity from prosecution for McNamee's murder and for a credit card fraud scheme. Fourth, defendant notes that Jeannette Blanco and Robert Murphy testified that they had heard Walter threaten to set defendant up for the McNamee murder because of defendant's relationship with Walter's mother. Fifth, during numerous interviews with newspaper and television reporters, Walter in the past had stated that neither she nor defendant was in Illinois at the time of the murder and that both were innocent. Defendant also contends that much of the State's evidence which placed defendant in possession of the murder weapon was contradictory. In this regard, defendant notes that the testimony of Michael Gasdiel, who stated that he brought Chuck Taylor to his father's home to obtain the rifle and that he then saw Taylor transfer the rifle to defendant, was contradicted by his own grand jury testimony and by the testimony of Michael's father, Glen Gasdiel. Glen Gasdiel testified that he gave the gun to Taylor, but that he did not remember Michael being present. Finally, defendant contends that there was conflicting testimony concerning the actual time of the shooting, thus providing a plausible alternative which did not implicate defendant. Here, defendant points out that Timothy Mahoney testified that he was not at the law offices between 9:20 p.m. and 6:45 a.m. Lisa Mapa testified that, while the lights of the law offices were on at about 9:15 p.m., 20 minutes later the lights were off and there was something lying in the driveway. Delores Zimmerman and her son, Russell Buschek, on the other hand, testified that they observed activity and that the law offices were well illuminated shortly before midnight on June 8. After hearing a sound like a firecracker and a ricochet, they observed a sporty, black car exit the law offices at high speed. Zimmerman stated that the man driving the sports car was Timothy Mahoney.

■■ ■ We note at the outset that there is no requirement that we exclude improperly admitted evidence in determining whether defendant was proved guilty beyond a reasonable doubt. (*People v. Furby* (1990), 138 Ill. 2d 434, 454, citing *Lockhart v. Nelson* (1988), 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285.) Of course, we have already concluded that the tape-recorded conversation was properly admitted into evidence, and we address defendant's argument with that fact in mind. Our supreme court in *Furby* set forth the following well-settled principles, applicable when addressing the sufficiency of the evidence:

"A reviewing court will not set aside a conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Williams* (1982), 93 Ill. 2d 309, 315; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) As we have previously stated, 'It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*Collins*, 106 Ill. 2d at 261.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360.)' (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43.) ' "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *** "Once a defendant has been found guilty of the crime charged, the factfinder's [*sic*] role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.)' *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *Furby,* 138 Ill. 2d at 455.

■■ Applying the above principles to the instant case, we conclude that the evidence is sufficient to sustain defendant's conviction of murder. Defendant's entire argument in this regard focuses on the credibility of the witnesses and the fact that there existed conflicting testimony. As stated, however, it is the responsibility of the jury to determine the credibility of witnesses. (*Furby*, 138 Ill. 2d at 455.) Moreover, a conflict in the evidence does not necessarily establish a reasonable doubt, and in such circumstances this court will not substi-

tute its judgment for that of the trier of fact. (*Furby*, 138 Ill. 2d at 456; *People v. Mendoza* (1991), 208 Ill. App. 3d 183, 204.) Viewing all of the evidence in the light most favorable to the State, we cannot say that the defendant was not proved guilty of murder beyond a reasonable doubt.

Defendant next argues that the trial court erred in denying his motions to admit the grand jury testimony of Cedric Whiteside. In May 1988 Whiteside testified before the grand jury which was investigating McNamee's murder. To summarize briefly, Whiteside testified that on June 8, 1987, he was with a man named Tom Delaney when Delaney killed McNamee. Whiteside's testimony thus tended to exculpate defendant in McNamee's death.

Defendant contends that Whiteside's testimony constitutes a statement against penal interests and, thus, pursuant to this court's decision in *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, is admissible as an exception to the rule against hearsay. The State argues that Whiteside's testimony does not fall within this exception to the hearsay rule and that the testimony was properly excluded. Specifically, the State argues that Whiteside's statements were not against his penal interests because he is not criminally accountable for Delaney's actions and because, prior to testifying, Whiteside had been granted immunity from prosecution for McNamee's murder. Defendant responds that the grant of immunity was not sufficient to erase the threat of future criminal liability, however, because Assistant State's Attorney Barsanti, during argument on defendant's motion, stated that Whiteside could still be prosecuted if he testified at trial and admitted sufficient facts to demonstrate his accountability. Defendant argues that, therefore, despite having been granted immunity from prosecution, Whiteside's statements were still made against his penal interests.

 Generally, out-of-court statements by the declarant that he, and not the defendant on trial, committed the crime are inadmissible as hearsay, even though the statements are against the declarant's penal interests. (*People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1017.) Such statements may be admissible, however, where justice requires, the main consideration being whether there exist considerable assurances of reliability by objective indicia of trustworthiness. *Kokoraleis*, 149 Ill. App. 3d at 1018.

 The United States Supreme Court in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, stated that the following factors were indicative of the trustworthiness of such statements: (1) the out-of-court statements were made spontane-

ously to a close acquaintance of the declarant shortly after the crime had occurred; (2) the out-of-court statement was corroborated by some other evidence in the case; (3) the statements were incriminatory and against penal interest; and (4) the declarant was present in the courtroom, was under oath, and could have been cross-examined by the State. (*Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49.) In *People v. Bowel* (1986), 111 Ill. 2d 58, 66-68, the Illinois Supreme Court determined that the four factors cited in *Chambers* were merely indicia of trustworthiness and not specific requirements to be met in order for statements to be admissible as statements against penal interest.

In *Kokoraleis*, relied upon by defendant in the instant case, this court concluded that the extrajudicial statements at issue in that case met two of the four *Chambers'* indicia of trustworthiness, in that they were corroborated by some other evidence and were clearly incriminating and against penal interest. We therefore held that the trial court had abused its discretion in excluding the statements, even though two of the four *Chambers* factors were not met. We cannot come to the same conclusion, however, in this case.

The first factor relied upon by the *Chambers* court is whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred. The statements contained in Whiteside's grand jury testimony clearly were not made spontaneously soon after the murder occurred and were not made to close friends, but instead were made to the grand jury. The second factor enumerated in *Chambers* is whether the statements were corroborated by some other evidence in the case. In this regard, we agree with defendant that this factor has been met. In his testimony, Whiteside stated that the gun used by Delaney to shoot McNamee had been left behind, and his description of the weapon matched that of the rifle subsequently discovered by the police. Whiteside's description of the area from where the shot had been fired was supported by the trajectory Officer Creegan had traced. Whiteside also explained the source of the beer cans found north of the fence surrounding the law office property. In addition, Whiteside's account of when the shooting took place was consistent with forensic pathologist Larry Blum's testimony regarding the time of death. Although the State argues that much of the information contained in Whiteside's testimony was also widely reported in the press, and therefore cannot be regarded as corroborative, we believe that such concerns go more to the weight to be accorded such testimony rather than admissibility. The fourth *Chambers* factor is whether the de-

clarant was present in the courtroom and could have been cross-examined by the State. During argument on defendant's motion, both defense counsel and Assistant State's Attorney Barsanti stated that neither knew where Whiteside could be located. Barsanti stated that Whiteside's attorney had told him that, if called to testify, Whiteside would be advised to invoke his fifth amendment rights and refuse to testify. Defense counsel produced an affidavit from an assistant public defender to the same effect. Thus, it is clear that the fourth factor has not been met. The third factor relied upon in *Chambers* is whether the statements were "in a very real sense self-incriminatory and unquestionably against interest." (*Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048.) As stated, the State argues that Whiteside's statements were not against his penal interests because, according to his grand jury testimony, he was not criminally accountable for Delaney's actions and also because, prior to testifying, Whiteside had been granted immunity from prosecution. Defendant argues that, despite having been granted immunity, Whiteside's statements were still made against his penal interests.

 █ Section 106—1 of the Code of Criminal Procedure of 1963 provides:

> "In any investigation before a Grand Jury, or trial in any court, the court on motion of the State may order that any material witness be released from all liability to be prosecuted or punished on account of any testimony or other evidence he may be required to produce." (Ill. Rev. Stat. 1987, ch. 38, par. 106—1.)

Section 106—2 of the Code of Criminal Procedure of 1963 provides:

> "Such order of immunity shall forever be a bar to prosecution against the witness for any offense shown in whole or in part by such testimony or other evidence except for perjury committed in the giving of such testimony." (Ill. Rev. Stat. 1987, ch. 38, par. 106—2.)

The Illinois Supreme Court has held that these statutory provisions provide transactional immunity. (*People ex rel. Cruz v. Fitzgerald* (1977), 66 Ill. 2d 546, 550.) Under use immunity, a witness' compelled testimony or leads derived therefrom may not be used in his prosecution. Under transaction immunity, however, the witness is fully immunized from prosecution for any offense to which his compelled testimony may relate. (*Fitzgerald*, 66 Ill. 2d at 549.) Thus, Assistant State's Attorney Barsanti's comments to the contrary notwithstanding, Whiteside is fully and forever immunized from

prosecution for the murder of Timothy McNamee. Having so concluded, we cannot say that Whiteside's grand jury testimony was "in a very real sense self-incriminatory and unquestionably against interest." *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048.

■■ ■ The defendant has failed to meet three of the four factors the United States Supreme Court discussed in *Chambers*. Although *People v. Bowel* (1986), 111 Ill. 2d 58, stands in part for the proposition that these factors represent indicia of trustworthiness rather than specific requirements which must be met, we believe it would be incongruous to apply the statement against penal interest exception to the rule against hearsay in a situation where the declarant's penal interests are not truly in jeopardy. A trial court's ruling excluding statements against penal interest will not be reversed absent an abuse of discretion (*People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1018), and we conclude that the trial court in this case did not abuse its discretion in refusing to admit Cedric Whiteside's grand jury testimony.

Next, defendant argues that the trial court erred in limiting the cross-examination of two witnesses for the State. Specifically, defendant argues that his sixth amendment right to confront and cross-examine the witnesses against him was violated when the trial court limited cross-examination of Michael Gasdiel and Nadine Walter. The State maintains that, even if the better practice would have been to allow more extensive cross-examination, any error that may have resulted was harmless.

At the time of trial, Michael Gasdiel had at least one criminal charge pending against him for felony theft and possibly as many as six pending charges in total. When defense counsel attempted to cross-examine Gasdiel about the pending charges, the trial court sustained the State's objection and held that defendant could not bring out this information without first establishing whether there had been a plea-bargain offer by the State. The jury was informed of Gasdiel's 1980 conviction of misdemeanor theft. Prior to trial, the State had moved *in limine* to prohibit the defense from impeaching Nadine Walter with certain prior acts of misconduct which had not resulted in convictions and for which charges had not been brought. The trial court granted the State's motion, and defendant was only permitted to cross-examine Walter regarding her involvement in a credit card scheme and the McNamee murder, for which Walter was granted immunity from prosecution.

The general rule is that a witness may be cross-examined concerning those matters which would show the witness' bias, motive, or willingness to testify. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441; *People v. Triplett* (1985), 108 Ill. 2d 463, 475.) Contrary to the conclusion reached by the trial court below, the defendant does not have to show before examining the witness that the witness has been promised leniency or expects to receive favorable treatment from the State. (*Triplett*, 108 Ill. 2d at 481.) However, the latitude of such cross-examination rests largely in the discretion of the trial court, and the court's substantial discretion will only be reversed where an abuse of that discretion results in manifest prejudice to the defendant. *Thompkins*, 121 Ill. 2d at 441-42; *People v. Owens* (1984), 102 Ill. 2d 88, 103.

At the time Michael Gasdiel was examined, defendant attempted to cross-examine him on a previous conviction of theft, which he claimed not to remember, and on pending drunk driving charges, which he also claimed not to remember. Gasdiel was also impeached with his grand jury testimony, in which he claimed that he did not see Chuck Taylor transfer a rifle to defendant, and was confronted with photographs showing that he could not have seen the transaction. Gasdiel's testimony in this regard was further weakened by the testimony of his father, Glen Gasdiel, who stated, contrary to Michael's testimony, that he did not recall Michael being present when he gave the rifle to Chuck Taylor. As to Nadine Walter, defendant cites no case law in support of his argument that denial of cross-examination as to misconduct for which criminal charges were not brought constitutes reversible error, and we conclude that it is without merit. Moreover, we agree with the State that defendant brought out ample evidence of Walter's bias and interest. The jury was informed that Walter had received immunity from prosecution for the murder of Timothy McNamee and for a credit card fraud scheme. The jury further was informed that Walter received living expenses from the State, in that her rent, utilities, car payments and food bills were being paid, in the amount of $7,002 at the time of trial. Moreover, Walter was in fact cross-examined about the fact that she violated a court order granting her custody of her son by removing him from the jurisdiction of the State, and on her belief and hope that the law enforcement officers involved in the instant case would help her find her son.

In light of the above, we conclude that ample impeachment evidence was presented from which the jury could judge Michael Gasdiel's credibility and, furthermore, that the evidence was more than

sufficient to point out to the jury that Nadine Walter was biased in favor of the prosecution. Therefore, we find that the error here, if any, in limiting cross-examination of Michael Gasdiel and Nadine Walter was harmless beyond a reasonable doubt. See *Thompkins*, 121 Ill. 2d at 442; see also *Owens*, 102 Ill. 2d at 104.

Finally, defendant argues that the trial court committed several sentencing errors. Specifically, defendant contends that the trial court erred in permitting the deceased's brother, Thomas McNamee, to make certain statements to the court during the sentencing hearing which allegedly exceeded the bounds of permissible victim impact statement subject matter. Defendant also argues that the trial court erred by considering an improper factor in aggravation and further erred in determining that the offense was brutal and heinous in nature and thus permitted the imposition of an extended-term sentence of natural-life imprisonment.

The State correctly notes that defendant failed to object specifically to the alleged errors at the sentencing hearing. We would further point out that defendant failed to raise any of the above issues in a post-trial motion. Both an objection at trial and a written post-trial motion raising the issues are required to preserve those issues for review. (*People v. Felella* (1989), 131 Ill. 2d 525, 541.) Here, defendant did not object to the nature of Thomas McNamee's statements at trial, nor did he object in a written post-trial motion. Neither did defendant object, either at trial or in a post-trial motion, to any facet of the trial judge's imposition of an extended-term sentence of natural-life imprisonment. As a result, defendant has waived consideration of these issues on appeal.

In any event, we have carefully reviewed the record and conclude that defendant's arguments in this regard are without merit. First, we note that the trial judge did not refer to McNamee's testimony or statement when setting forth his reasons for sentencing defendant to natural-life imprisonment. Absent proof to the contrary, we may presume that the trial judge considered only relevant, material and competent evidence in deciding whether to impose an extended-term sentence. *People v. Terrell* (1989), 132 Ill. 2d 178, 218-19.

Second, we do not believe the trial court improperly considered in aggravation a factor, that defendant's conduct caused or threatened to cause serious bodily injury, that was inherent in the offense of first degree murder. In *People v. Saldivar* (1986), 113 Ill. 2d 256, our supreme court stated that, in sentencing a defendant on a conviction for voluntary manslaughter, it is permissible for the

trial court, in applying the above-referenced statutory aggravating factor, to consider the force employed and the physical manner in which the victim's death was brought about. (*Saldivar*, 113 Ill. 2d at 271.) In sentencing defendant, the trial judge stated as follows:

> "Now, the factors in—in—under normal factors in mitigation—I mean, in aggravation that I would have to look at would be, number one, did the Defendant's conduct cause or threaten serious bodily harm? Well, obviously it did, someone died.
>
> * * *
>
> This act appeared to have been premeditated. It certainly was senseless. It was in retribution over a previous act, the—the court battle over the child. There certainly was absence of provocation. And the shooting was done at close enough range with a high-powered weapon that it was obvious that it would result in death or grave and permanent injury to the victim.
>
> * * *
>
> *** But thinking of the act itself, to cold-bloodily go out and do what was said, the taking of a life, this—this is such an enormous violation of the law. You took a life, and death isn't a possibility in this case, but life imprisonment is."

The trial judge's statements clearly focused on the force employed and the physical manner in which McNamee's death was brought about, and not simply the fact of death itself. Therefore, the trial court did not err in considering this factor in aggravation.

Third, the trial court did not err in concluding that defendant's conduct was sufficiently brutal or heinous to justify imposition of a natural-life sentence. Such a sentence may be imposed if the trial court finds that the murder was accompanied by "brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)). In *People v. La Pointe* (1981), 88 Ill. 2d 482, the Illinois Supreme Court stated:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural-life imprisonment to only those murders involving torture or the infliction of unnecessary pain." *La Pointe*, 88 Ill. 2d at 501.

See also *People v. McGee* (1984), 121 Ill. App. 3d 1086, 1090.

In *La Pointe*, where the supreme court affirmed a sentence of natural-life imprisonment, the record indicated that the defendant acted with "premeditated, cold-blooded deliberation" when he killed a cab driver. (*La Pointe*, 88 Ill. 2d at 501.) In *McGee*, this court upheld an extended-term sentence for attempted murder after concluding that the following factors demonstrated that the offense was accompanied by exceptionally brutal or heinous behavior:

> "[D]efendant's premeditated, senseless act in shooting the victim in apparent retribution over a previous argument; the absence of any immediate provocation by the unarmed victim; defendant's indifference to any potential harm to the many other people around which could be caused by the shotgun blast; and defendant's shooting of the victim with a shotgun at close range which obviously would result in death or grave and permanent injury to the victim." *McGee*, 121 Ill. App. 3d at 1091.

In light of *La Pointe* and *McGee*, we believe that the record supports the trial judge's finding that the offense herein was accompanied by exceptionally brutal or heinous behavior, and we conclude, therefore, that the trial judge was clearly justified in imposing a sentence of natural-life imprisonment. The trial court's sentencing determination is entitled to great weight (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154) and will not be overturned absent an abuse of that discretion (*People v. Felella* (1989), 131 Ill. 2d 525, 541). After reviewing the record in this case, we cannot say that the trial court abused its discretion in sentencing defendant to natural-life imprisonment.

For all of the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

GEIGER and WOODWARD, JJ., concur.