2020 IL App (1st) 182037

No. 1-18-2037

Opinion filed September 3, 2020

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,   )    Appeal from the Circuit
  )    Court of Cook County.
      Plaintiff-Appellee,   )
  )
     v.   )    No. 16 CR 00792
  )
DONNIE RUDD,   )    Honorable
  )    Marc W. Martin,
      Defendant-Appellant.   )    Judge, presiding.

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     In 2018, defendant, Donnie Rudd, was convicted of murder in connection with the 1973 death of his wife, Noreen Kumeta Rudd. He was sentenced to 75 to 150 years in prison. On appeal, defendant argues that the trial court erred in allowing the State to admit evidence that he was the beneficiary of several life insurance policies that Noreen obtained through her employment. He also challenges the trial court's ruling denying his motion to suppress his statements to police, arguing that he did not waive his sixth amendment right to counsel prior to the questioning. Finally, he contends that the trial court erred in denying his motion for a mistrial after the prosecutor

referenced a notorious and factually similar murder case when questioning a witness. For the following reasons, we reject defendant's contentions and affirm the circuit court's judgment.[1]

¶ 2                                    I. BACKGROUND

¶ 3                                    A. Noreen's Death

¶ 4      Defendant and Noreen began dating in the spring of 1973. Noreen, who was 19 years old, worked as a librarian for Quaker Oats in Barrington, Illinois. Defendant, then 31, also worked for Quaker Oats, as a patent attorney. After a brief courtship, they were married on August 18, 1973.

¶ 5      Noreen died less than a month later, on September 14, 1973. That evening at 11:30, Officer Christopher Bish of the Barrington Hills Police Department responded to a reported single-vehicle accident on Route 63 (now Route 68) near Bateman Road in Cook County. At the time, Route 63 was a two-lane road with no streetlights. The area was desolate and sparsely populated. The conditions that night were clear, dark, and dry. When Bish arrived, he saw defendant's car on a grassy area off the shoulder of Route 63, resting against bushes, small trees, and a barbed-wire fence. Bish noted a straight line of tire marks in the grass, measuring 165 feet, from the spot where defendant's car left the road to where it came to rest. Bish observed only minor damage, consisting of scratches, to the front of the vehicle and passenger door.

¶ 6      When Bish arrived, defendant was sitting in the passenger seat, and Noreen was lying across the front seats with her head in defendant's lap. Bish observed blood on the passenger door and side of the passenger seat. He did not see any blood on the ground outside the vehicle. Bish and another officer removed Noreen from the car and performed CPR. While doing so, Bish noted

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

that Noreen's head was bleeding profusely and felt soft and "spongy." She had no other visible injuries, and Bish did not see any grass or dirt on her clothing. Defendant was uninjured.

¶ 7    Noreen was taken by ambulance to a hospital in neighboring Kane County, where she was pronounced dead on arrival. The emergency room physician, Dr. Jae Han, noted an avulsion of Noreen's scalp (meaning a tearing of the skin from the skull) and a fractured cervical spine. At trial, Dr. Han could not recall how he arrived at the latter diagnosis, but he testified that he would not have ordered an X-ray on a dead body.

¶ 8    Defendant told Bish that he was driving on Route 63 when another car entered his lane. He said that he honked his horn and switched on his bright lights before driving off the road when the other car continued toward him. As he did so, defendant said, the passenger door of his car opened and Noreen was ejected. Defendant identified an area behind his car where he said there was a rock with Noreen's hair and blood on it, but Bish did not find any such rock. Defendant told Bish that, after someone arrived but did not render aid, he carried Noreen back to the car.

¶ 9    In October 1973, the Kane County coroner convened a coroner's inquest, empaneling a jury to hear evidence and determine the cause and manner of Noreen's death. Defendant and Bish were the only witnesses who testified. Bish described the scene and surrounding events in the manner recounted above. Defendant testified that he and Noreen were returning home when a car entered their lane. As the car continued in their direction even after he honked his horn, defendant drove off the road and onto the shoulder. Defendant testified that, as he did so, the passenger door "came open and [Noreen] started to go out the door." He testified that he "reached and grabbed" for Noreen as his car hit some "light brush." He testified that, after impact, he "was apparently out for a portion of *** time" and his legs "were pinned by the door and the door was pinned by some

fencing." After someone arrived and opened the door, defendant testified, he "got out of the car and brought [Noreen] back to the car and tried to help her."

¶ 10   No autopsy was conducted. Instead, the coroner informed the jury (presumably based on Dr. Han's report) that "the immediate cause of death was due to [a] fracture of [the] cervical spine, as the consequence of trauma." The verdict of the coroner's inquest was that Noreen died "from a fracture of the cervical spine suffered when she was thrown from a car driven by her husband when it left the road." Her death was ruled accidental.

¶ 11                         B. The Renewed Investigation

¶ 12   That is where things stood until 2012, when Detective Richard Sperando of the Arlington Heights Police Department took a fresh look at the case. In February 2013, Sperando obtained a court order to exhume Noreen's body. An autopsy revealed that Noreen died of craniocerebral injuries due to blunt force trauma and found no evidence of injury to her cervical spine.

¶ 13   In December 2013, Sperando interviewed defendant in Texas, where he then resided. Defendant denied killing Noreen but admitted to collecting a substantial sum of life insurance proceeds after her death. He stated that Noreen's $100,000 accidental death policy was "customary back then" and that "just about everybody" at Quaker Oats had one. He denied knowing, however, that he was the beneficiary of Noreen's policy before her death.

¶ 14                         C. Defendant's Motion to Suppress

¶ 15   In January 2016, a grand jury indicted defendant for Noreen's murder. Before trial, defendant moved to suppress his December 2013 statements. He argued that adversary judicial proceedings had commenced at the time of the interview, triggering his sixth amendment right to counsel, because police had filed a complaint to obtain a warrant for his arrest, and because

prosecutors had exercised significant involvement in the investigation and the filing of the complaint.

¶ 16    At a hearing on the motion, Sperando testified that, in September 2012, he reopened an investigation into the unsolved 1991 murder of Lauretta Tabak-Bodtke. Defendant was the victim's lawyer at the time of her death and the only suspect in her murder. Information in that case file revealed the then-official details of Noreen's death and that defendant had been the beneficiary of her life insurance policies. Sperando spoke with a Barrington Hills police sergeant to see if that department was interested in opening an investigation into Noreen's death. The sergeant informed Sperando that his department lacked the resources to do so. Because Barrington Hills and Arlington Heights are both located in Cook County, Sperando proceeded with the investigation himself.

¶ 17    In December 2012, Sperando began interviewing various witnesses. He also contacted the state's attorney's office (SAO) for assistance in obtaining a grand jury subpoena for documents related to Noreen's life insurance policies. Sperando prepared the paperwork for the subpoena and submitted it to the SAO. An assistant state's attorney (ASA) presented the subpoena to the grand jury. The subpoena directed the recipient to send responsive documents directly to Sperando.

¶ 18    In January 2013, Sperando contacted ASA Thomas Biesty of the SAO's cold-case unit. Sperando told ASA Biesty that he wanted to obtain an order to exhume Noreen's body for the purpose of conducting an autopsy. Using a template provided by ASA Biesty, Sperando prepared a petition for an exhumation order. ASA Biesty filed the petition in February 2013, and he and Sperando appeared before a circuit court judge, who signed the order. Sperando then made arrangements for the exhumation and autopsy. The autopsy was performed by Dr. Hilary

McElligot, a forensic pathologist under contract with the Kane County coroner's office. No member of the SAO was present for the exhumation or autopsy. After learning the results of the autopsy, Sperando asked ASA Biesty to approve a murder charge against defendant. ASA Biesty declined to file charges at that time and told Sperando to continue the investigation.

¶ 19    In the spring of 2013, ASAs Marcia McCarthy and David Coleman (who later prosecuted the case at trial) began to assist Sperando with the investigation. In March 2013, ASA Coleman obtained a second grand jury subpoena for documents related to Noreen's life insurance policies. Like the first subpoena, this one also directed the recipient to send responsive documents directly to Sperando. In May 2013, ASA McCarthy retained Dr. Mary Case, the chief medical examiner of St. Louis County, Missouri, to review Dr. McElligot's autopsy results and other relevant documents and render a second opinion on the cause and manner of Noreen's death. (Prosecutors later sought a third opinion from Dr. Stephen Cina, then the chief medical examiner of Cook County.)

¶ 20    In June 2013, ASAs McCarthy and Coleman asked Sperando to obtain documents from the Illinois Department of Transportation concerning the condition of Route 63 at the time of Noreen's death. They also asked Sperando to make arrangements for them to interview several witnesses whom Sperando had already interviewed. In August 2013, the SAO arranged for Bish to travel to Illinois from his home in Georgia. ASAs McCarthy and Coleman and several Arlington Heights police officers, including Sperando, accompanied Bish to the site of Noreen's death and discussed what Bish had observed at the time.

¶ 21    In October 2013, Dr. Case reported conclusions consistent with Dr. McElligot's concerning the cause and manner of Noreen's death. Sperando again asked prosecutors to charge defendant

with Noreen's murder. The prosecutors declined to file charges and informed Sperando that further investigation was necessary.

¶ 22 In December 2013, Sperando told ASAs McCarthy and Coleman that he wanted to interview defendant. The prosecutors stated that they would accompany Sperando to Texas to observe the interview. Sperando made arrangements for the interview with local police in Texas. Before leaving for Texas, Sperando asked ASA McCarthy for approval to seek a warrant for defendant's arrest in case he refused to go to the local police station voluntarily. ASA McCarthy approved the request for purposes of facilitating the interview but told Sperando that no formal charges would be filed against defendant at that time absent a confession. ASA McCarthy explained that she would move to recall the arrest warrant if defendant did not confess during the interview. Sperando prepared a complaint and presented it to a judge, who issued a warrant for defendant's arrest. ASA McCarthy did not assist in the preparation of the complaint nor was she or any other prosecutor present when Sperando presented it to the judge.

¶ 23 On December 17, 2013, Sperando and his partner located defendant exiting a grocery store in Sugar Land, Texas. They approached him in the parking lot and introduced themselves as Arlington Heights police detectives. They informed defendant that they were investigating the Tabak-Bodtke homicide, that he was still a suspect in that matter, and that they wanted to ask him a few questions. They did not tell defendant that he was under arrest nor did they inform him that they had a warrant for his arrest. Defendant agreed to accompany the detectives to the police station for questioning.

¶ 24 At the station, the detectives placed defendant in an interview room equipped with a video-recording device. Only Sperando and his partner were present with defendant in the interview

room. ASAs McCarthy and Coleman and an Arlington Heights police commander observed the interview from another room via closed circuit television. Before the interview, ASAs McCarthy and Coleman discussed with Sperando what topics would be covered in the interview, but they did not dictate the details of his questioning. Likewise, Sperando consulted with the prosecutors during breaks in the interview, but they did not provide him direction during those consultations.

¶ 25    Before questioning defendant, Sperando advised him of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant waived those rights and agreed to speak with the detectives. The detectives proceeded to question defendant about both Noreen's and Tabak-Bodtke's deaths. As discussed above, defendant denied killing Noreen but made several statements concerning her life insurance policies that the State later introduced at trial. After the interview concluded, Sperando again asked the prosecutors to charge defendant with murder. They declined to authorize charges and explained that they would move to recall the arrest warrant upon returning to Illinois. On December 19, 2013, ASA McCarthy appeared before a judge and moved to recall the warrant. The judge granted the request.

¶ 26    The trial court entered a written opinion denying defendant's motion to suppress. The court held that defendant had no sixth amendment right to counsel at the time of the interview. The court concluded that adversary judicial proceedings had not commenced against defendant at the time of the interview because he had not made an initial appearance before a judicial officer. In addition, citing *People v. Garrett*, 179 Ill. 2d 239 (1997), the court held that the filing of a complaint by a police officer without the assistance of prosecutors did not constitute a formal commitment by the State to prosecute defendant that would trigger his sixth amendment right to counsel. The court also rejected defendant's contention that the degree of prosecutorial involvement in the

investigation signified a commitment to prosecute defendant. The court explained that the SAO's actions prior to and during the interview were of an investigatory rather than accusatory nature.

¶ 27 Finally, the court held that, even if defendant's sixth amendment right to counsel had attached, he validly waived that right. Citing *Patterson v. Illinois*, 487 U.S. 285 (1988), the court held that defendant's knowing and intelligent waiver of his fifth amendment right to counsel following receipt of *Miranda* warnings also served to knowingly and intelligently waive any sixth amendment right to counsel he may have had. The court rejected defendant's contention that the detectives' failure to inform him of the issuance of the arrest warrant left him unaware of the seriousness of the situation he faced and thus rendered any waiver of his sixth amendment right to counsel invalid. The court noted that defendant knew the detectives had traveled from Illinois to Texas to question him about an open murder investigation in which he was a suspect. The court also noted that the questioning took place in a police station and was preceded by *Miranda* warnings. The court concluded that, even without knowledge of the arrest warrant, the "seriousness of the situation could not have been lost on [defendant]."

¶ 28                    D. Motion *in Limine* to Present Life Insurance Evidence

¶ 29 Also before trial, the State moved *in limine* to admit evidence of Noreen's life insurance policies. The State argued that the evidence was relevant to proving defendant's guilt because it established his motive for killing Noreen. Defendant responded that the evidence was not sufficient to establish his motive because the State could not show that he knew of the life insurance policies, or his status as a beneficiary, before Noreen's death.

¶ 30 The evidence presented at the motion hearing (and later at trial) established that, in the spring of 1973, Noreen was 19 years old and lived at home with her mother and younger sister.

She worked as a librarian at Quaker Oats, where she made $4800 per year ($27,400 in today's dollars).[2] She started working after graduating from high school and had no college education. Noreen's father had died several years earlier, without life insurance, which caused financial difficulty for the family. According to Noreen's sister, however, Noreen did not express any interest in financial matters.

¶ 31    Defendant was 31 years old and worked for Quaker Oats as a patent attorney with a salary of $18,700 per year ($106,500 in today's dollars). While dating Noreen, defendant was living with another woman, Diane Marks, and her two children. He had divorced his first wife, with whom he had four children, a year earlier. Marks's daughter, Laurel, testified that defendant and Marks struggled financially in the spring and summer of 1973. Defendant and Marks talked frequently about getting married until one day, in mid-August 1973, defendant suddenly announced that he was marrying someone else. According to Laurel, defendant spent that night with Marks and moved out the next day. Within days, defendant and Noreen were married. Laurel testified that defendant maintained contact with Marks during his marriage to Noreen, calling her frequently. He spent the night of Noreen's funeral at Marks's home and moved back in over the next few weeks. Defendant and Marks eventually married in May 1974.

¶ 32    At the time of Noreen's death, Quakers Oats offered all employees a basic life insurance policy, provided at no cost to the employee, that would pay the employee's named beneficiary an amount equal to the employee's annual salary (rounded to the next thousand) in the event of the employee's death. In addition, employees could elect to purchase (through payroll deductions) a

---

[2]We have rounded the relevant figures for convenience. All inflation adjustments have been made using the United States Bureau of Labor Statistics' Consumer Price Index Inflation Calculator. See *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 13, 2020) [https://perma.cc/2KRM-2MJU].

supplemental life insurance policy, survivor income insurance policy, and accident insurance policy. The supplemental life insurance policy would pay the employee's named beneficiary an amount equal to one, two, or three times the employee's annual salary (also rounded to the next thousand), depending on the amount of coverage the employee elected. The survivor income insurance policy would pay the employee's surviving spouse 25% of the employee's salary, in monthly installments, for five years after the employee's death. And the accident insurance policy would pay the employee's named beneficiary an amount between $10,000 and $100,000 (selected by the employee in increments of $10,000) in the event of the employee's accidental death. Noreen purchased the supplemental life insurance policy with the maximum coverage of three times her annual salary, the survivor income insurance policy, and the accident insurance policy with the maximum coverage of $100,000. The cost to purchase that amount of accident insurance coverage was $3.90 per month (nearly 1% of Noreen's pre-tax salary).

¶ 33     For the basic and supplemental life insurance policies and the accident insurance policy, Noreen had to affirmatively designate her beneficiary. Because the survivor income insurance policy was available only to employees with a lawful spouse, Noreen had to present a marriage certificate when electing that coverage. There was no evidence of when Noreen signed up for these policies or when she designated defendant as her beneficiary. An employee did not have to notify the person whom she named as her beneficiary nor would Quaker Oats notify that person of their status as a beneficiary.

¶ 34     After Noreen's death, defendant collected $20,000 as the beneficiary of her basic and supplemental life insurance policies and $100,000 as the beneficiary of her accident insurance policy. (The combined $120,000 is equal to nearly $664,000 in today's dollars.) In a memo issued

at the time, defendant was informed and acknowledged that he would also receive 25% of Noreen's salary, in monthly installments, "for a maximum of five years following the month in which she died *** as long as [defendant] remain[ed] eligible under the terms of the contract." No evidence was presented, however, about whether defendant remained eligible to collect under this policy for the maximum period of five years.

¶ 35    As discussed above, defendant admitted in his interview with police that he received $100,000 as the beneficiary of Noreen's accident insurance policy. Although a Quaker Oats benefits administrator testified that few employees elected this coverage, defendant told police that the policy was "customary" and that "just about everybody" at Quaker Oats had it. Defendant also claimed that he did not learn he was the beneficiary of Noreen's policy until after her death.

¶ 36    The trial court granted the State's motion *in limine*. The court recognized that evidence of a defendant's motive to commit a crime is relevant to proving his guilt. Reviewing the evidence offered by the State, the court found that it was sufficient to allow the jury to reasonably conclude that defendant knew of Noreen's insurance policies and his beneficiary status prior to Noreen's death. The court explained that, because defendant and Noreen worked for the same company, the jury could conclude that defendant knew that Noreen "possessed *some form* of valid life insurance through work before her death." The court further explained that, based on defendant's statement to police that almost all Quaker Oats employees had a $100,000 accident insurance policy at the time, the jury could reasonably conclude that defendant knew that Noreen had that policy in particular.

¶ 37    Finally, the court determined that a reasonable jury could conclude that defendant was aware of his status as the beneficiary of Noreen's policies prior to her death. The court explained

that "[w]ith marriage comes intimacy, including potentially sharing details about life insurance—at least a jury could reasonably find." The court also noted that Noreen had no dependents and did "not appear [to have] a premature preoccupation with death[ ] or estate planning" and that, "by nature of his age and secondary education," defendant was more financially sophisticated than she was. The court stressed that its role was limited to determining whether the life insurance evidence was admissible and that "[f]inal factual determinations" about the evidence and its impact on defendant's motive would be made by the jury at trial.

¶ 38                               E. Trial

¶ 39     At trial, the State presented the evidence discussed above concerning the circumstances of defendant and Noreen's marriage, Noreen's life insurance policies, and the initially reported details of Noreen's death. The State also presented testimony from three forensic pathologists who reassessed the cause and manner of Noreen's death following the exhumation and autopsy of her body in 2013.

¶ 40     Dr. McElligot, who performed the autopsy, testified that Noreen had a 3-inch laceration on the upper left side of her head that was "complex and branching" and a second, 1-inch laceration on the upper right side of her head. Dr. McElligot found no evidence of any other external injuries to Noreen's body. On internal examination, Dr. McElligot identified two subgaleal hemorrhages or bleeding in the space between the scalp and the skull. The first involved a two-inch area of bleeding under the laceration on the right side of Noreen's head. The second was diffused across a much larger area under the complex and branching laceration on the left side of Noreen's head. Under the diffused hemorrhage, Dr. McElligot identified a complex and branching fracture on the left side of Noreen's skull. Dr. McElligot found no evidence of injury to Noreen's cervical spine.

She further noted that Noreen's spine and skull were attached and ruled out the possibility of atlanto-occipital dislocation (also known as internal decapitation).

¶ 41    Dr. McElligot concluded that Noreen's death was caused by craniocerebral injuries due to blunt force trauma and that the manner of death was homicide. She opined that Noreen's injuries were consistent with having sustained multiple blows to the head. She further opined that Noreen's injuries were not consistent with various scenarios involving Noreen having been thrown from a vehicle during a low-speed, low-impact accident and striking her head on an object such as the door, a window, or a rock. Dr. McElligot explained that, if a person were to fall out of a moving car, one would expect to find abrasions or contusions on the person's body or grass stains on the person's clothing, neither of which were present in Noreen's case.

¶ 42    The State also called Dr. Case and Dr. Cina, who had reviewed Dr. McElligot's autopsy report and other records and concurred in her findings. Defendant presented his own expert, Dr. Robert Hurwitz, a radiologist but not a forensic pathologist, who disagreed with Dr. McElligot's findings. Dr. Hurwitz opined that Noreen died of craniocervical disruption or atlanto-occipital dislocation, which he stated was consistent with Noreen having been ejected from an automobile during a high-speed accident and striking her head on a fixed object or surface. Dr. Hurwitz agreed that there was evidence of blunt force trauma to Noreen's head, but he opined that those injuries were not fatal.

¶ 43    While cross-examining the current Kane County coroner, defendant's counsel elicited that the coroner's official records of Noreen's death continue to list the cause and manner of death initially determined by the coroner's inquest in 1973 as well as the new cause and manner of death determined after Dr. McElligot's autopsy in 2013. On re-direct examination, the coroner explained

that, once manner of death is determined at a coroner's inquest, an official death certificate cannot be altered. The prosecutor then asked the coroner if he was "familiar with the Drew Peterson case." The coroner responded that he was. Defense counsel then objected, and the trial court sustained the objection. The prosecutor asked the coroner one additional, unrelated question, and the witness was then excused.

¶ 44     At a sidebar conference, defense counsel moved for a mistrial. Counsel argued that, due to the notoriety of the Peterson case and its factual similarities to defendant's case, the prosecutor's reference to it was extremely prejudicial.[3] The prosecutor responded that she asked the question solely for the purpose of allowing the coroner to explain that, even in that case, where the defendant was convicted of murder for a death that was initially ruled accidental, the victim's death certificate was not revised accordingly. The trial court agreed that the reference was "highly prejudicial" and "inappropriate," but it took the request for a mistrial under advisement. In response to an inquiry from the court, defense counsel indicated that defendant did not want the jury immediately instructed to disregard the comment, but that defendant reserved the right to request such an instruction at the close of the case.

¶ 45     The trial court revisited the matter after the State rested. The court reiterated that the State's reference to the Peterson case was inappropriate, but it denied defendant's motion for a mistrial. The court noted that the comment was "fleeting" and that an objection was quickly sustained. The court also noted that the Peterson case was not referenced at any other point in the State's case and

_____

[3]Peterson's ex-wife was found dead in a bathtub in 2004, in the midst of the couple's contentious divorce proceedings. An autopsy performed at the time concluded that the cause of death was drowning, and a coroner's inquest ruled the death accidental. After Peterson's next wife disappeared three years later, his ex-wife's body was exhumed and a new autopsy concluded that the manner of death was homicide. Peterson was eventually convicted of first degree murder in the case, which drew national media attention. See *People v. Peterson*, 2017 IL 120331, ¶¶ 4-10, 94-96.

that it did not expect any additional reference would be made going forward. In addition, the court noted that it had instructed the jury in its pretrial remarks to disregard any questions or answers to which objections were sustained, and the court explained that it would deliver a similar instruction to the jury at the close of the case. The court also indicated that it would consider any request from defense counsel to deliver a more detailed instruction. Defense counsel ultimately declined to request a specific instruction regarding the reference to the Peterson case and relied instead on the standard jury instruction advising jurors to disregard questions and answers to which objections were sustained.

¶ 46    Following deliberations, the jury found defendant guilty. The trial court denied defendant's motion for a new trial and sentenced him to an indeterminate term of 75 to 150 years in prison. After defendant's motion to reconsider the sentence was denied, defendant filed a timely notice of appeal.

¶ 47                                II. ANALYSIS

¶ 48                        A. The Life Insurance Evidence

¶ 49    Defendant's first argument on appeal is that the trial court erred in allowing the State to introduce evidence of Noreen's life insurance policies to establish his motive for killing her. He contends that the evidence was not relevant to proving his motive because the State did not show that he knew of the existence of the policies or his status as a beneficiary prior to Noreen's death. Determining the relevance and admissibility of evidence lies within the trial court's discretion, and we will not reverse a trial court's evidentiary ruling absent an abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). A trial court abuses its discretion only where its decision is

arbitrary, fanciful, or unreasonable or where no reasonable jurist would adopt its view. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 50    Evidence is admissible only if relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Although the State need not prove motive to sustain a murder conviction, "any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders [it] more probable that the accused did kill the deceased." *People v. Smith*, 141 Ill. 2d 40, 56 (1990).

¶ 51    For evidence of motive to be competent, "it must, at least to a slight degree, tend to establish the existence of the motive relied upon or alleged." *Id.* "Thus, when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts." *Id.* In particular, when the State seeks to establish a defendant's motive by introducing evidence of an insurance policy on the victim's life, it must "provide evidence that the accused knew of the policy, knew it was valid, or believed it was valid, and knew that [he] would benefit therefrom." *Id.* at 56-57.

¶ 52    Because motive evidence is conditionally relevant, its admissibility is governed by Illinois Rule of Evidence 104(b) (eff. Jan. 1, 2011), which provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Ill. R. Evid. 104(b) (eff. Jan. 1, 2011). "In determining whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that

the Government has proved the conditional fact by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 690 (1988) (applying identical federal rule). Rather, the court "simply examines all the evidence in the case and decides whether *the jury* could reasonably find the conditional fact *** by a preponderance of the evidence." (Emphasis added.) *Id.*; see *People v. Bruce*, 299 Ill. App. 3d 61, 65 (1998) ("If the relevance of a piece of evidence depends on the truth of some other fact, the piece of evidence is admissible if there is sufficient evidence to support a finding by a reasonable juror that the factual condition has been fulfilled.").

¶ 53    Life insurance evidence is thus admissible to prove motive where the trier of fact could conclude that the defendant knew of the existence of the policy, knew or believed it was valid, and knew that he was the beneficiary. *People v. Coleman*, 49 Ill. 2d 565, 572 (1971). If that minimal standard is met, it is "proper for the court to admit the policies and for the trier of fact to weigh [that] evidence together with all of the other evidence on the question of the defendant's motive." *Id.*

¶ 54    We agree with the trial court that the evidence here was sufficient to permit a reasonable jury to conclude that defendant knew of the existence of Noreen's life insurance policies and his beneficiary status before her death. The trial court cited two facts from which it believed a reasonable jury could conclude that defendant knew of the existence of Noreen's life insurance policies before her death. First, the court explained that, because defendant and Noreen both worked for Quaker Oats and because Quaker Oats offered its employees various forms of life insurance, the jury could reasonably conclude that defendant knew that Noreen "possessed *some form* of valid life insurance through work before her death."

¶ 55　Defendant concedes this point but contends that it does not reasonably support the further inference that he knew Noreen had elected any of the optional life insurance policies that Quaker Oats offered, such as the supplemental life insurance policy, the survivor income insurance policy, or the accident insurance policy. But the trial court also relied on defendant's statement asserting that the $100,000 accident insurance policy that Noreen had was "customary back then" and that "just about everybody" at Quaker Oats had it. As the court explained, the jury could reasonably infer from that statement that defendant knew (or at least believed), prior to Noreen's death, that Noreen had the $100,000 accident insurance policy.[4]

¶ 56　Defendant characterizes his statement as "flippant" and notes that the Quaker Oats benefits administrator testified that, in fact, very few employees opted for such coverage. What matters, however, is not whether defendant's statement was correct but whether it reflected his understanding, as even a person's mistaken belief can supply a motive for murder. In determining whether the life insurance evidence was relevant and admissible, it was not the trial court's role to make credibility assessments or factual findings. Rather, the court's limited gatekeeping task under Rule 104(b) was "simply [to] examine[ ] all the evidence in the case and decide[ ] whether the jury could reasonably find" that defendant possessed the requisite knowledge. *Huddleston*, 485 U.S. at 690. The jury was entitled to accept defendant's statement at face value and could thus reasonably conclude that he knew (or believed) that Noreen had the $100,000 accident insurance policy.

---

[4]Although defendant did not make a similar statement regarding Noreen's $15,000 supplemental life insurance policy or the survivor income insurance policy (which at most would have paid out about $6250 over a five-year period), he does not argue that evidence of those policies should have been excluded even if evidence of the $100,000 accident insurance policy were admitted. He has thus forfeited any such argument. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited ***."). Forfeiture aside, any error in admitting evidence of the supplemental life insurance policy and the survivor income insurance policy would be harmless in light of the (proper) admission of the far greater accident insurance policy.

¶ 57    The jury could also reasonably conclude that defendant knew, prior to Noreen's death, that he was the beneficiary of her life insurance policies. As the trial court explained, due to the age and educational disparities between defendant and Noreen, and the nature of their marital relationship, the jury could reasonably infer that Noreen discussed the details of her life insurance elections and beneficiary designations with defendant. Testimony from Noreen's sister that Noreen did not express interest in financial matters lends further support for that conclusion.

¶ 58    Defendant deems this inference unsupported and offensive, but we do not see it that way. When evaluating evidence and "choosing from among competing inferences, jurors are entitled to take full advantage of their collective experience and common sense." *United States v. O'Brien*, 14 F.3d 703, 708 (1st Cir. 1994); see Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014) (instructing jurors to "consider all the evidence in the light of your own observations and experience in life"). That is especially true when the question before the jury is one of knowledge, which is "ordinarily *** proven circumstantially" (*People v. Ortiz*, 196 Ill. 2d 236, 260 (2001)) and "can be inferred from the surrounding facts and circumstances" (*People v. Frazier*, 2016 IL App (1st) 140911, ¶ 23). We do not find it offensive or unreasonable to infer that a 19-year-old woman (or man) with no college education and no apparent interest in financial matters would discuss the details of a substantial life insurance policy with her (or his) older and more educated spouse.

¶ 59    In reaching this conclusion, the trial court remarked that "[w]ith marriage comes intimacy, including potentially sharing details about life insurance—at least a jury could reasonably find." Defendant seizes on the court's use of the word "potentially," arguing that the mere potential or possibility that spouses might discuss the details of their life insurance policies with each other is

not enough to support a reasonable inference that defendant and Noreen did so. But defendant reads the trial court's statement out of context. It is clear from the quoted sentence (as well as the trial court's opinion as a whole) that the court applied the proper standard for assessing the relevance and admissibility of the life insurance evidence: whether the evidence was sufficient to allow the jury to reasonably conclude that defendant knew of the existence of Noreen's life insurance policies and his beneficiary status before her death. The trial court did not rely on mere speculation, as defendant suggests.

¶ 60    Defendant relatedly asserts that the trial court applied a *per se* rule imputing knowledge of the details of one spouse's life insurance policies to the other spouse. It did not. Rather, the court considered both the nature of marital relationships in general and certain facts about this marriage in particular. As discussed, the trial court emphasized that Noreen was young, had no dependents, and did not appear interested in financial matters, whereas defendant was significantly older and more educated. The trial court did not abuse its discretion in concluding that a reasonable jury could find, from the totality of these circumstances, that defendant knew Noreen had made him the beneficiary of her life insurance policies.

¶ 61    Because we "may affirm the trial court's evidentiary rulings upon any basis that is supported by the record" (*People v. Davis*, 2018 IL App (1st) 152413, ¶ 37), we note that additional facts provide further support for the trial court's ruling. The evidence showed that during his courtship with Noreen, defendant was living with Marks and her children. Marks's daughter, Laurel, testified that defendant and Marks were financially strained during that period. Laurel also testified that defendant and Marks spoke often about getting married. Yet one day, out of the blue, defendant announced that he was marrying someone else—and within days, he was married to

Noreen. The marriage, as we know, lasted less than a month. And according to Laurel, defendant maintained contact with Marks during his brief marriage to Noreen and moved back in with Marks shortly after Noreen's death.

¶ 62     The evidence also showed that, at the time of her death, Noreen had what can aptly be described as an unusual amount of life insurance. She was 19 years old, had no dependents, and made about $5000 per year. She had also just married a man who made nearly four times what she did. Yet in addition to the basic life insurance policy funded by her employer (which would pay a lump sum equal to her yearly salary), Noreen opted to purchase a supplemental life insurance policy that would pay three times her yearly salary (the maximum amount offered), a survivor income insurance policy that would pay 25% of her salary for up to five years, and an accident insurance policy that would pay $100,000 (again the maximum amount offered). The latter policy alone covered 20 times Noreen's yearly salary. With no dependents and a husband who earned substantially more than she did, it is difficult to fathom why Noreen would need so much life insurance coverage.

¶ 63     Defendant cites testimony that Noreen's family was left in difficult financial straits when her father died without life insurance. But while that event would have likely instilled in Noreen the importance of protecting one's dependents with life insurance, it does not explain why she would have felt the need to purchase such a large amount of life insurance for herself at a time when she had no dependents. And regardless of the possibility of defendant's alternative explanation for Noreen's insurance elections, "[t]he use of circumstantial evidence is not limited to those instances in which the circumstances support only one logical conclusion. Circumstantial evidence will suffice whenever an appropriate inference may reasonably be drawn therefrom."

*People v. Davis*, 248 Ill. App. 3d 886, 893 (1993). It was the responsibility of the jury, not the trial court or this court, to decide which of various reasonable inferences should be drawn from the evidence.

¶ 64    Defendant also notes that there was no evidence with respect to when Noreen first elected to purchase the optional insurance coverage and suggests that she may have done so before marrying him. But with respect to at least one of the policies—the survivor income insurance policy—the evidence at trial showed that it would not have been available to Noreen before she was married. And regardless of when Noreen may have first elected any of the policies, the key point is that the jury could reasonably conclude that Noreen would not have made defendant her beneficiary without discussing the matter with him either at or around the time of their marriage. In light of the totality of the evidence, we agree with the trial court that the jury could reasonably conclude that defendant knew of Noreen's life insurance policies and his beneficiary status under them prior to Noreen's death.

¶ 65    Defendant makes a final, perfunctory argument that the probative value of the life insurance evidence was substantially outweighed by the danger of unfair prejudice. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). This undeveloped argument is forfeited. See *People v. Lacy*, 407 Ill. App. 3d 442, 459 (2011) (undeveloped, one-sentence argument is forfeited). The argument is also meritless. Evidence of defendant's motive for killing Noreen was of significant probative value in determining his guilt. See *People v. Felton*, 2019 IL App (3d) 150595, ¶ 46 (noting that evidence establishing "a clear motive" for the defendant to commit the charged offense "had significant probative value"). In contrast, there was little danger that the life insurance evidence would create unfair prejudice, which in this context means "an undue tendency to suggest decision on an

improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." (Internal quotation marks omitted.) *People v. Ward*, 2011 IL 108690, ¶ 41. For all these reasons, the trial court did not abuse its discretion in allowing the State to introduce the life insurance evidence.

¶ 66                                B. Defendant's Motion to Suppress

¶ 67    Defendant next argues that the trial court erred in denying his motion to suppress the statements he made in his December 2013 interview with police. He contends that he had a sixth amendment right to counsel at the interview and that he did not knowingly and intelligently waive that right. We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, deferring to the court's factual findings unless they are against the manifest weight of the evidence but reviewing its ultimate legal conclusions *de novo*. See *People v. Eubanks*, 2019 IL 123525, ¶ 33.

¶ 68    The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. "By its very terms, [this right to counsel] becomes applicable only when the government's role shifts from investigation to accusation" (*Moran v. Burbine*, 475 U.S. 412, 430 (1986)) and "does not attach until a prosecution is commenced" (*McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Specifically, the sixth amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (Internal quotation marks omitted.) *United States v. Gouveia*, 467 U.S. 180, 188 (1984). Drawing the line at initiation of adversary judicial proceedings "is not mere formalism" but rather "a recognition of the point at which the government has committed

itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial forces of organized society." (Internal quotation marks omitted.) *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008). "[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer v. Williams*, 430 U.S. 387, 401 (1977).

¶ 69  Defendant contends that his sixth amendment right to counsel had attached at the time of the interview because a complaint seeking a warrant for his arrest had been filed and an arrest warrant had issued. But our supreme court has held that, absent significant prosecutorial involvement, neither the filing of a complaint for an arrest warrant nor the issuance of an arrest warrant constitutes the commencement of adversarial judicial proceedings triggering a defendant's sixth amendment right to counsel. See *People v. Hayes*, 139 Ill. 2d 89, 124-26 (1990); *People v. Thompkins*, 121 Ill. 2d 401, 433 (1988); *People v. Wilson*, 116 Ill. 2d 29, 50-51 (1987).

¶ 70  Under Illinois law, a felony prosecution may be commenced only by way of indictment or information, not criminal complaint. See 725 ILCS 5/111-2(a) (West 2016); *People v. Nally*, 216 Ill. App. 3d 742, 764-65 (1991); *People v. Racanelli*, 132 Ill. App. 3d 124, 130 (1985). The purpose of a complaint is to provide grounds for a judicial determination of probable cause to issue an arrest warrant. See 725 ILCS 5/107-9 (West 2016). Under analogous federal rules, appellate courts have held that "the mere filing of a federal criminal complaint does not trigger the [sixth amendment] right to counsel." *United States v. States*, 652 F.3d 734, 741 (7th Cir. 2011) (collecting cases). As one court explained, "[i]f an arrest does not trigger the Sixth Amendment right to counsel, we are unable to see how the issuance of a complaint that serves as the basis for a probable cause determination authorizing a later arrest would trigger that right." *United States v. Moore*,

122 F.3d 1154, 1156 (8th Cir. 1997). In other words, "because of its limited role as the precursor to an arrest warrant," a complaint does not "constitute a 'formal charge' for purposes of the Sixth Amendment." *United States v. Boskic*, 545 F.3d 69, 83 (1st Cir. 2008).

¶ 71 As noted, Illinois precedent holds that the filing of a complaint for an arrest warrant may trigger a defendant's sixth amendment right to counsel where there was "significant prosecutorial involvement in procuring the arrest warrant." *Hayes*, 139 Ill. 2d at 126; see *People v. Owens*, 102 Ill. 2d 88, 101 (1984) ("whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement"). It is not clear that this precedent remains sound following the decision of the United States Supreme Court in *Rothgery*. There, a defendant was arrested by police without a warrant and was brought before a judge for his initial appearance under state law, at which the court formally apprised him of the accusation against him, determined that probable cause existed for the arrest, and set bail. See *Rothgery*, 554 U.S. at 195-96. The lower courts held that the initial appearance did not commence adversary judicial proceedings against the defendant for sixth amendment purposes because local prosecutors were not aware of or involved in the arrest or appearance. *Id.* at 197-98.

¶ 72 Reiterating the well-established rule that a defendant's sixth amendment right to counsel attaches at his "initial appearance before a judicial officer," the Supreme Court rejected the lower courts' view that attachment should depend "not on whether a first appearance has begun adversary judicial proceedings, but on whether the prosecutor had a hand in starting it." *Id.* at 199, 206. The Court explained that "an attachment rule that turned on determining the moment of a prosecutor's first involvement would be wholly unworkable" and "guaranteed to bog the courts down in prying enquiries into the communications between police *** and the State's attorneys."

(Internal quotation marks omitted.) *Id.* at 206. Instead, the Court adopted a bright-line rule that "an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution." *Id.* at 207. That is so, the Court stressed, "whether the machinery of prosecution was turned on by the local police or the state [prosecutor]." *Id.* at 208. Accordingly, the Court held, "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." *Id.* at 213.

¶ 73 The State argues that, under *Rothgery*, the only question for purposes of determining whether a defendant's sixth amendment right to counsel has attached is whether the defendant has made his initial appearance before a judicial officer and that no inquiry into prosecutorial involvement prior to that stage is permissible. While *Rothgery* held that the lack of prosecutorial involvement in a defendant's initial appearance does not *prevent* attachment of the defendant's sixth amendment right to counsel, the decision does not address the reverse situation, presented here, where prosecutorial involvement is alleged to have *triggered* a defendant's sixth amendment right to counsel in the absence of a judicial appearance.

¶ 74 We find it unnecessary to resolve the issue here. Applying existing Illinois precedent, we conclude that the degree of prosecutorial involvement in securing the warrant for defendant's arrest was not significant enough to trigger defendant's sixth amendment right to counsel. The evidence at the suppression hearing established that Sperando prepared the complaint without prosecutorial assistance and that no prosecutor was present when he submitted the complaint to the judge.

In addition, while ASA McCarthy approved Sperando's request to seek the arrest warrant, she made clear that it would be used solely to facilitate an interview with defendant and that, absent a confession by defendant during the interview, no charges would be filed against him at that time. In light of these facts, ASA McCarthy's mere review of the complaint before it was filed did not constitute significant "prosecutor[ial] involvement in the procurement of the warrant" and "did not signal a commitment by the State to prosecute the defendant." *Hayes*, 139 Ill. 2d at 125-26.

¶ 75 Defendant also cites the prosecutors' actions in submitting subpoenas to the grand jury, assisting Sperando in securing a court order to exhume Noreen's body, interviewing witnesses, visiting the scene of Noreen's death, directing Sperando to request certain evidence from a state agency, securing a second opinion on Noreen's cause and manner of death, traveling to Texas to observe defendant's interview, and conferring with Sperando prior to and during breaks in the interview. But these actions functioned "solely to assist law enforcement officers in their investigation." *People v. Ballard*, 206 Ill. 2d 151, 173 (2002). Throughout the process, the prosecutors' "role was one of investigation and not accusation." *Id.* Indeed, on numerous occasions during the course of the investigation, prosecutors declined Sperando's requests to file charges against defendant and instructed Sperando to continue the investigation. At no point prior to or during defendant's interview had the State "committed itself to prosecute [defendant]" (internal quotation marks omitted) (*Rothgery*, 554 U.S. at 198), nor in that period did the State's "role shift[ ] from investigation to accusation" (*Moran*, 475 U.S. at 430) in a manner that triggered defendant's sixth amendment right to counsel.

¶ 76 Finally, even if defendant had a sixth amendment right to counsel at the interview, we conclude that he validly waived that right. "[T]he Sixth Amendment right to counsel may be

waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). Defendant does not dispute that he was advised of his right to remain silent and his right to counsel via *Miranda* warnings (see *Miranda*, 384 U.S. at 444) and that he voluntarily, knowingly, and intelligently waived those rights. As the trial court noted, defendant "did not contest knowingly and voluntarily waiving his *Miranda*-based right to counsel before speaking to the police." Defendant contends, however, that the waiver of his *Miranda* rights did not serve to effectively waive his sixth amendment right to counsel.

¶ 77    But "when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically" serves to waive any sixth amendment right to counsel as well. *Montejo*, 556 U.S. at 786. By making a defendant "aware of his right to have counsel present during the questioning," *Miranda* warnings "convey[ ] to [the defendant] the sum and substance of the rights that the Sixth Amendment provide[s] him." *Patterson*, 487 U.S. at 293. In addition, by advising a defendant "that any statement that he [makes can] be used against him in subsequent criminal proceedings," "the *Miranda* warnings also serve[ ] to make [him] aware of the consequences of a decision *** to waive his Sixth Amendment rights during *** questioning." *Id.* Recognizing these realities, the *Patterson* Court adopted a "pragmatic approach to the waiver question." *Id.* at 298. "As a general matter," the Court held, "an accused who is admonished with the warnings prescribed by [*Miranda*] has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Id.* at 296.

¶ 78    Attempting to sidestep *Patterson*, defendant argues that he could not have knowingly and intelligently waived his sixth amendment right to counsel without being informed that a complaint had been filed against him and a warrant issued for his arrest. Without that knowledge, defendant contends, he lacked sufficient awareness of the gravity of his situation, and therefore the true consequences of a decision to speak with police uncounseled, to make any waiver of his right to counsel knowing and intelligent. *Patterson* left open the question whether a person "must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid." *Id.* at 295 n.8. But lower courts that have addressed the question following *Patterson* have concluded that such a requirement would be inconsistent with *Patterson*'s pragmatic approach to the waiver inquiry. See, *e.g.*, *United States v. Chadwick*, 999 F.2d 1282, 1284-86 (8th Cir. 1993); *United States v. Charria*, 919 F.2d 842, 847-48 (2nd Cir. 1990); *Riddick v. Edmiston*, 894 F.2d 586, 590-91 (3rd Cir. 1990).

¶ 79    These decisions recognize that the "key inquiry" in *Patterson*'s waiver analysis is whether the defendant was "made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel." *Patterson*, 487 U.S. at 292-93. *Miranda* warnings impart that information by advising a defendant not only of his right to the presence of counsel at questioning but also of "the ultimate adverse consequence" of making an uncounseled statement to police—that it could be used against him at a subsequent criminal trial. *Id.* at 293-94. As *Patterson* explained, "[t]he State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities." *Id.* at 298-99. There is thus no

support within the *Patterson* framework for the notion that a defendant's waiver of his sixth amendment right to counsel is invalid unless he is first informed that a complaint and arrest warrant have been filed against him.

¶ 80    Like the trial court, however, we think defendant was sufficiently aware of the gravity of his situation to support a knowing and intelligent waiver of his sixth amendment right to counsel even under his preferred test. Although defendant was unaware that police had filed a complaint and secured a warrant for his arrest based on Noreen's murder, he was told by detectives that they wanted to speak with him about a separate murder investigation in which he was a suspect. The gravity of the situation was further reinforced when the detectives took defendant (who was an attorney himself) to a local police station for questioning and read him *Miranda* warnings. In light of these circumstances, we agree with the trial court's conclusion that the seriousness of the situation could not have been lost on defendant, even without specific knowledge that detectives had secured a warrant for his arrest.

¶ 81                          C. Defendant's Motion for Mistrial

¶ 82    Defendant's final contention is that the trial court erred in denying his motion for a mistrial following the prosecutor's reference to the Peterson case. "A trial court has broad discretion to determine the propriety of declaring a mistrial." *People v. Hall*, 194 Ill. 2d 305, 341 (2000). "A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *People v. Redd*, 135 Ill. 2d 252, 323 (1990).

¶ 83    Although the decision to declare a mistrial lies within the trial court's discretion, defendant contends that we should review whether the prosecutor's reference to the Peterson case deprived

him of a fair trial *de novo*. There is support for this proposition in cases holding that *de novo* review applies to the question whether improper prosecutorial comments in closing argument "were so egregious that they warrant a new trial." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). As we have explained, when a prosecutor's closing argument comments are challenged, we apply an abuse of discretion standard to the trial court's determination regarding the propriety of the challenged comments but review whether any improper comments were sufficiently egregious to warrant a new trial *de novo*. See *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64. We think a similar bifurcated standard of review is appropriate here.

¶ 84    The State does not defend the prosecutor's reference to the Peterson case, and we have little difficulty concluding that it was improper. As recounted above, the prosecutor asked the Kane County coroner whether he was familiar with the Peterson case. As the prosecutor later explained outside the presence of the jury, she asked the question in an effort to establish that it was not unusual that Noreen's death certificate declaring her death accidental had not been revised after a subsequent autopsy determined that the manner of death was homicide. While that was certainly a legitimate topic of inquiry, it was wholly inappropriate (and unnecessary) to raise it with reference to the well-publicized and factually similar Peterson case.

¶ 85    Nevertheless, it is equally apparent that the prosecutor's improper question did not deny defendant a fair trial. After the coroner answered that he was aware of the Peterson case, the trial court sustained defendant's objection to the question and the line of inquiry ceased. The trial court later instructed the jury, as part of its standard jury instructions, to disregard any question or answer to which an objection was sustained. (As a matter of trial strategy, defense counsel opted not to seek a more specific jury instruction on the subject.) "Generally, if a timely objection is made at

trial to improper interrogation, the court can, by sustaining the objection or instructing the jury to disregard the question and answer, usually correct the error." *Hall*, 194 Ill. 2d at 342; see also *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them."). Because the prosecutor's reference to the Peterson case was isolated and fleeting, we are confident that the promptly sustained objection and subsequent jury instruction effectively cured the error and prevented any prejudice to defendant. For that reason, the trial court did not err in denying defendant's motion for a mistrial.

¶ 86                                 III. CONCLUSION

¶ 87    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 88    Affirmed.

---

**No. 1-18-2037**

---

| | |
|---|---|
| **Cite as:** | *People v. Rudd*, 2020 IL App (1st) 182037 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-00792; the Hon. Marc W. Martin, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Timothy M. Grace, of Gottreich Grace & Thompson, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Paul E. Wojcicki, Assistant State's Attorneys, of counsel), for the People. |

---